UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTH STAR GAS COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY, et al.,<br><br>Defendants. | Case No.  15-cv-02575-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STAY AND/OR DISMISS; DENYING DEFENDANTS' MOTION FOR SANCTIONS; SETTING CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. Nos. 22, 32 |

Before the Court is Defendants Pacific Gas & Electric Company, Albert Torres, Bill Chen, and Tanisha Robinson's (together, "Defendants") motion to stay and/or dismiss the complaint filed by Plaintiff North Star Gas Company ("Plaintiff").  Dkt. No. 22 ("MTD").  Defendants seek to stay Plaintiff's federal law claims under the doctrine of primary jurisdiction and dismiss its state law claims under the doctrine of exclusive jurisdiction in favor of state agency proceedings before the California Public Utility Commission ("CPUC").  Alternatively, Defendants move to dismiss for failure to plead with particularity under Federal Rule of Civil Procedure 9(b) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Plaintiff has filed an opposition, Dkt. No. 33 ("MTD Opp."), and Defendants have replied, Dkt. No. 36 ("MTD Reply").  At the Court's direction, the parties also filed supplemental briefing on Plaintiff's Sherman Act claim. Dkt. Nos. 49 ("Defs.' Supp.") and 50 ("Pl.'s Supp.").

Defendants have also filed a motion for sanctions against Plaintiff under Federal Rule of Civil Procedure 11 for asserting a purportedly frivolous claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1691, *et seq.* against Defendants Torres, Chen, and Robinson (together, "Individual Defendants").  Dkt. No. 32 ("SM").  Plaintiff has filed an opposition, Dkt. No. 38 ("SM Opp."), and Defendants have replied, Dkt. No. 39 ("SM Reply").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART**

2    Defendants' motion to stay and/or dismiss, **DENIES** Defendants' motion for sanctions, and **SETS**

3    an initial case management conference for October 11, 2016, at 2:00pm to discuss scheduling.

4    **I.    BACKGROUND**

5        **A.    Factual Allegations**

6            1.    CPUC's Natural-Gas Utility Deregulation Program

7    Since 1905, PG&E has been a public utility monopolist in Northern California, providing

8    natural gas and electricity service to retail customers.  Compl. ¶¶ 2, 15, 22.  In 1991, California

9    partially deregulated the natural-gas utility market.  *Id.* ¶ 24.  As part of deregulation, CPUC, the

10   California agency that regulates PG&E and the public utility markets, started a pilot program that

11   gives residential and small commercial natural-gas utility customers, known as "core" customers,

12   the option to aggregate their natural-gas utility purchasing and participate in a competitive natural

13   gas market.  *Id.* ¶¶ 16, 22, 25.  The purpose of this pilot program is to allow these core customers

14   to obtain lower gas prices and weaken PG&E's monopoly to promote competition.  *Id.* ¶ 26.

15   To implement its deregulation program, CPUC first certifies privately-owned natural gas

16   providers as "core transport agents," or CTAs.  *Id.* ¶ 25.  These CTAs are then allowed to compete

17   with PG&E (and other utility monopolists) by selling natural gas directly to core customers who

18   have elected to participate.  *Id.* ¶¶ 25, 28-29.  But CTAs still rely on PG&E's physical distribution

19   system to deliver the natural gas to core customers.  *Id.* ¶¶ 27, 29.  For that reason, PG&E charges

20   a "transportation" fee to the core customers who purchase their natural gas from CTAs.  *Id.* ¶ 29.

21   Another aspect of the deregulation program is that CTAs have the right to choose to have

22   their billing consolidated with PG&E's billing.  *Id.* ¶ 30.  In other words, CTAs can have their bill

23   to participating natural-gas utility customers appear as a part of the same bill that PG&E sends to

24   collect other charges to those customers, *i.e.* electricity charges.  *Id.* ¶ 31.[1]  The customer pays

25   both sets of charges with a single payment to PG&E, which is then supposed to remit the funds to

26

27   [1] If a CTA chooses the consolidated billing option, PG&E must calculate the CTA's charges based
     on the customer's natural gas usage and apply the proprietary and confidential rate provided by the

28   CTA to PG&E each month.  *Id.*  PG&E assumes responsibility for the accuracy of the calculation,
     but not for the rate the CTA provides to it.  *Id.*

United States District Court
Northern District of California

1    the CTA, deducting the transportation charge and PG&E's electricity charge, if any. *Id.* ¶¶ 30-32,

2    42. Payment to the CTA is due 17 days after the bill was sent to the customer or the next business

3    day after the payment is received from the customer. *Id.* ¶¶ 30-32. As a result, PG&E also serves

4    as the collections agent for the CTAs. *Id.* ¶¶ 32, 35. If any payments from customers to PG&E

5    fail, *e.g.* a customer's check bounces, PG&E may debit those amounts to the CTA on the

6    customer's billing statement for the following month. *Id.* ¶ 34. No other debts or set-offs are

7    permitted. *Id.* PG&E conducts its consolidated billing program as a separate unit from its primary

8    business. *Id.* ¶ 33. The Individual Defendants manage consolidated billing operations for PG&E.

9    *Id.* ¶¶ 17, 33.

10                   2.    The Parties' Dispute Regarding the Deregulation Program

11        Plaintiff, a privately-owned natural gas supplier, is a CTA (as certified by CPUC). *Id.* ¶¶

12   2, 36. Plaintiff signed an operations and service agreement with PG&E on November 9, 2011, and

13   began serving core customers in Northern California shortly thereafter. *Id.* ¶ 36. The agreement

14   between Plaintiff and PG&E is governed by a regulation known as Gas Rule 23. *Id.* ¶¶ 31-33, 35.

15   Plaintiff supplies its gas by transporting it across interstate pipelines for delivery to PG&E. *Id.* ¶

16   37. Once the gas arrives, PG&E charges Plaintiff for storage and transportation to the customer

17   based on Plaintiff's overall delivery volume as calculated on a monthly and yearly basis. *Id.* ¶ 37.

18        Plaintiff also elects to use the consolidated PG&E billing program. *Id.* ¶ 40. To track the

19   billing process, PG&E provides Plaintiff with "electronic data interchanges," or EDIs. *Id.* ¶ 44.

20   These files provide a variety of information about Plaintiff's customer accounts, including: (1)

21   those to whom PG&E has sent a bill; (2) those who have paid Plaintiff's previous charges and the

22   amount PG&E apportioned to Plaintiff; (3) the unpaid balance of any accounts; (4) the identity of

23   those customers who have not fully paid for Plaintiff's gas service; and (5) the number and

24   identity of those customers who have had charges written off, or "reversed," by PG&E. *Id.* ¶ 45.

25        Plaintiff alleges PG&E has engaged in five forms of misconduct against it with respect to

26   the operation of the consolidated billing program.[2] First, Plaintiff alleges that PG&E, as a pattern

27   _____

28   [2] Plaintiff explicitly identifies four different schemes, but the Court considers the "payment
     withholding scheme" to be conceptually distinct from PG&E's alleged pattern and/or practice of

1    and practice, fails to remit funds that are owed to Plaintiff.  *Id.* ¶ 43.  Plaintiff claims that PG&E

2    has simply withheld several hundred thousand dollars of payments it has received from customers.

3    *Id.*

4    　　　　Second, Plaintiff alleges that PG&E, as a pattern and practice, intentionally sends EDIs

5    containing false information to damage relations between Plaintiff and its customers.  *Id.* ¶ 50.

6    Specifically, PG&E allegedly transmits EDI files that show Plaintiff's customers are delinquent on

7    their bills, which causes Plaintiff to contact them and/or terminate their accounts.  *Id.* ¶¶ 48, 51.

8    But it is often the case that a customer marked as delinquent has fully paid their bill.  *Id.* ¶ 49.

9    Plaintiff alleges that it has cancelled over 10,000 customer accounts, based on potentially false

10   information about their payment status.  *Id.* ¶¶ 53-54.  This scheme also often causes Plaintiff's

11   customers to choose to cancel their service with Plaintiff and revert back to PG&E's service.  *E.g.,*

12   *id.* ¶ 51(b).  PG&E then prevents Plaintiff from contacting the customers by withholding

13   information regarding their accounts, citing privacy concerns.  *Id.* ¶¶ 58-59.  In combination with

14   the payment withholding scheme, the end result of PG&E's alleged scheme to falsely induce

15   Plaintiff to terminate the service of its customers is that PG&E takes natural gas from Plaintiff,

16   charges Plaintiff for its storage and transportation, delivers it to Plaintiff's customers, charges and

17   collects from them, and then keeps those funds, too.  *Id.* ¶¶ 55-56.

18   　　　　Third, Plaintiff alleges that PG&E, as a pattern and practice, impermissibly offsets the

19   amounts owed to Plaintiff for natural gas service with credits earned against its electricity charges.

20   *Id.* ¶¶ 60-61.  For example, PG&E offers its electricity customers certain subsidies and credits for

21   obtaining their electricity through solar panels.  *Id.* ¶ 62.  Plaintiff alleges that PG&E takes these

22   credits and subsidies, which should be applied against a customer's electricity bill from PG&E,

23   and applies them against Plaintiff's gas bill instead.  *Id.* ¶ 63; *see also id.* ¶ 64 (specific examples).

24   In addition to avoiding the cost of these credits against its revenue, PG&E falsely informs Plaintiff

25   that it has not applied this credit against the natural gas bill, but tells the customer that it has.  *Id.* ¶

26   65.  In short, according to Plaintiff, PG&E uses its EDI system to underwrite its business for free

27

28

United States District Court
Northern District of California

falsely identifying Plaintiff's customers as delinquent on their bills, as further explained below.

at Plaintiff's expense.  *Id.* ¶¶ 66-69.  This scheme also has the practical effect of inducing Plaintiff to terminate many of its customer accounts for nonpayment.  *Id.* ¶ 65.  Many customers also cancel their accounts and revert to PG&E because of the resulting confusion.  *Id.* ¶ 70.  And PG&E again cites customer privacy concerns as a basis to withhold information about these accounts from Plaintiff.  *Id.* ¶ 71.

Fourth, Plaintiff alleges that PG&E, as a pattern and practice, withholds money owed to Plaintiff by claiming that the charges were "reversed," *i.e.* cancelled as wrongly billed.  *Id.* ¶ 73.  Specifically, PG&E will send an EDI file to Plaintiff stating that a customer owes an amount and then will send another EDI file showing that the charge was reversed.  *Id.* ¶ 75(a).  Since April 2013, PG&E has reversed a total of $320,369 in collectible funds.  *Id.* ¶ 76.  In December 2014 alone, PG&E reversed 1,535 customer account charges, costing Plaintiff $177,347.  *Id.*  PG&E backdates many of these reversals to make it appear as though the reversals were much closer to the billing date.  *Id.* ¶ 77.  At a minimum, this alleged scheme harms Plaintiff's cash cycle.  *Id.* ¶ 82.

Fifth, and finally, Plaintiff alleges that PG&E, as a pattern and/or practice, uses the contact occasioned by its other schemes to improperly and inaccurately tell Plaintiff's customers that PG&E's natural gas prices are less expensive.  *Id.* ¶¶ 83, 85-86; *see also id.* ¶ 84 (specific examples).

Plaintiff alleges that PG&E's various illegal schemes have caused it to lose two-thirds of its customers in the PG&E service area in the year before the complaint was filed.  *Id.* ¶ 87.  When Plaintiff contacted PG&E about these issues, one employee who works for Defendant Robinson informed it that these events were business as usual and that PG&E would not stop.  *Id.* ¶ 88.

**B.    Procedural History**

1.    Plaintiff's Complaint

Plaintiff filed this action on June 9, 2015.  Based on the allegations set forth above, Plaintiff asserts claims under federal and state law.  Against the Individual Defendants, Plaintiff asserts substantive and conspiracy violations of the civil Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.  Id.* ¶¶ 89-111.  Against PG&E alone,

United States District Court
Northern District of California

1   Plaintiff asserts claims for: (1) respondeat superior liability for the RICO counts; (2) attempt to

2   monopolize in violation of the Sherman Act, 15 U.S.C. § 2; (3) breach of fiduciary duty; (4)

3   intentional misrepresentation; (5) negligent misrepresentation; (6) conversion; (7) intentional

4   interference with contractual relations; (8) intentional interference with prospective business

5   advantage; (9) breach of contract; and (10) violation of state unfair competition law, Cal. Bus. &

6   Prof. Code § 17200, *et seq. Id.* ¶ 112-187.  Plaintiffs seek actual damages and treble damages

7   under the RICO statute, treble damages under the Sherman Act, exemplary and punitive damages,

8   and attorneys' fees and costs.  *Id.* at 37, Prayer.

9                   2.       Defendants' Motion to Stay and/or Dismiss

10      Defendants contend that the Court should temporarily stay and abstain from hearing

11  Plaintiff's federal law claims in favor of proceedings before CPUC under the prudential doctrine

12  of primary jurisdiction.  MTD at 6-8.  Defendants take the position that abstention is appropriate

13  because Plaintiff's claims under the civil RICO Act and the Sherman Act are within the special

14  competence of CPUC, and the Court should allow it to make an initial determination as to their

15  validity.  Defendants acknowledge that the primary jurisdiction doctrine typically relates to federal

16  agencies, but contend that it is an open question in the Ninth Circuit whether the doctrine can

17  apply to state agencies.  *Id.* at 8, n.5.

18      Similarly, Defendants assert that the Court should dismiss with prejudice Plaintiff's state

19  law claims because California Public Utilities Code § 1759 purportedly gives CPUC exclusive

20  jurisdiction to hear certain claims asserted against utility companies under California law.  *Id.* at 8-

21  9.  Specifically, Defendants contend that CPUC has properly exercised its authority to adopt a

22  regulatory policy regarding CTAs and their service to core customers in Gas Rule 23 and that the

23  exercise of federal jurisdiction interferes with CPUC's exercise of that regulatory authority.  *Id.*

24      In any case, Defendants argue that the operations and service agreement between PG&E

25  and Plaintiff contains a forum selection clause that contractually obligates Plaintiff to resolve any

26  disputes with PG&E that are based on that agreement before CPUC.  *Id.* at 9-10.  At the least, by

27  Defendants' account, this provision encompasses Plaintiff's breach of contract claim.  *Id.* at 22-23.

28      Alternatively, in the event that the Court finds that Plaintiff's claims should be heard in

United States District Court
Northern District of California

6

1   federal court and not before CPUC, Defendants contend that they should be dismissed for failure

2   to be pled with particularity under Federal Rule of Civil Procedure 9(b). *Id.* at 10-11. And even if

3   Plaintiff had properly pled its claims under Rule 9(b), Defendants contend that they should still be

4   dismissed for failure to state a claim upon which relief can be granted under Federal Rule of Civil

5   Procedure 12(b)(6). *Id.* at 11-25. Defendants focus on Plaintiff's RICO and Sherman Act claims.

6   With regard to the RICO claims, Defendants contend that Plaintiff has failed to adequately show a

7   "pattern" of "racketeering activity." Further, Defendants contend that there is no separate

8   "enterprise" to conduct any kind of racketeering activity because the Individual Defendants were

9   merely performing their jobs. And Defendants argue that Plaintiff has failed to state a claim for

10   attempted monopolization under the Sherman Act because there are no sufficient allegations that

11   Defendants have monopoly power in a market or that they have engaged in anticompetitive

12   conduct.

13        Plaintiff responds that Defendants' primary jurisdiction argument is fatally flawed because

14   Congress has not committed any of the federal issues in this lawsuit—violation of the civil RICO

15   Act and the Sherman Act—to CPUC. *Id.* at 11-12. Without congressional delegation of authority

16   to CPUC, there is no basis to abstain from federal jurisdiction. Moreover, for that reason, CPUC

17   has no technical expertise handling RICO and antitrust claims that would support deferring to it

18   with regard to Plaintiff's federal claims in the first instance. *Id.* In fact, Plaintiff notes that CPUC

19   has stated it has no such experience in an agency action in a similar case. *Id.* at 11.

20        With respect to the Defendants' argument that CPUC has exclusive jurisdiction over its

21   state law claims, Plaintiff responds that California Public Utilities Code § 1759 does not apply.

22   Plaintiff explains that CPUC cannot award monetary damages and, for that reason, California law

23   permits its courts to hear suits at law against utilities unless they would interfere with authorized

24   CPUC policy. Plaintiff argues that CPUC has no stated policy on the issues raised by its state law

25   claims and that Gas Rule 23 has no bearing on the facts underlying Plaintiff's tort claims. And, in

26   any case, Plaintiff claims that this lawsuit cannot impact California's administration of its utility

27   regulatory regime because it does not seek injunctive or otherwise prospective relief. *Id.* at 12.

28        Plaintiff also maintains that it has pled its claims with particularity under Rule 9(b) and has

1    properly stated its claims under Rule 12(b)(6).  In regard to its RICO Act claims, Plaintiff argues

2    that it has sufficiently identified the existence of an associated-in-fact enterprise, the consolidated

3    billing department that is operated by the Individual Defendants and is separate from PG&E.  And

4    the alleged predicate acts that create a pattern of racketeering activity are numerous instances of

5    interstate wire fraud that arose when PG&E transmitted fraudulent EDI files.  With respect to its

6    Sherman Act claim, Plaintiff explains that it has alleged market power in a relevant market by

7    identifying PG&E's market share and geographical reach in Northern California.   PG&E's

8    anticompetitive conduct, according to Plaintiff, is comprised of the various schemes that Plaintiff

9    has alleged.

10                    3.      Defendants' Motion for Sanctions

11           Separately, Defendants move for sanctions against Plaintiff for alleging that the Individual

12   Defendants violated the civil RICO statute.  Defendants contend that there is no legal basis to state

13   such claims because the Individual Defendants are merely employees of PG&E and there are no

14   facts sufficient to show a pattern of racketeering activity.  SM at 1-2.  These claims, according to

15   Defendants, were also alleged without a proper investigation of the facts.  Defendants provided a

16   21-day safe harbor notice to Plaintiff, which refused to withdraw its complaint.  Defendants seek a

17   monetary sanction against Plaintiff and its counsel, including reasonable attorneys' fees and costs.

18           Plaintiff responds that Defendants use their sanctions motion to provide inappropriate

19   supplemental briefing on their motion to dismiss.  For the reasons stated in the opposition,

20   Plaintiff contends that it has a sufficient factual and legal basis to assert a civil RICO claim against

21   the Individual Defendants.  Furthermore, Plaintiff argues that there is no rule requiring it to engage

22   in pre-litigation discovery in order to justify its claims.  In any case, Plaintiff points to its pre-

23   filing research as evidence that it sufficiently evaluated the factual basis of these claims.

24   **II.     REQUESTS FOR JUDICIAL NOTICE**

25           Before turning to the substance of Defendants' motions, the Court addresses the various

26   requests for judicial notice that the parties have filed in support of their positions.

27           **A.      Legal Standard**

28           The doctrine of judicial notice permits courts to take as true "a fact that is not subject to

United States District Court
Northern District of California

United States District Court
Northern District of California

1  reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction;

2  or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably

3  be questioned." Fed. R. Evid. 201(b). "[M]atters of public record" are judicially-noticeable

4  material, *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted), which

5  include "records and reports of administrative bodies," *United States v. Ritchie*, 342 F.3d 903, 908

6  (9th Cir. 2003) (citation omitted). The existence of proceedings in other courts, including orders

7  and filings, is also a matter of public record and judicially-noticeable when directly related to the

8  case. *Tigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (internal citations omitted).

9     Similarly, under the incorporation by reference doctrine, a court may consider a document

10  extrinsic to the complaint in deciding a Rule 12(b)(6) motion if the document's "authenticity is not

11  contested and the plaintiff's complaint necessarily relies on" it. *Lee,* 250 F.3d at 688 (citing

12  *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)); *see also United States v. Ritchie*, 342

13  F.3d 903, 908 (9th Cir. 2003) (document may be incorporated by reference "if the plaintiff refers

14  extensively to the document or the document forms the basis of the plaintiff's claim"). This

15  doctrine seeks to prevent a plaintiff from "deliberately omitting references to documents upon

16  which their claims are based." *Parrino v. FHP, Inc.*, 342 F.3d at 705-06. To that effect, when a

17  materials are incorporated by reference, "the district court may treat such a document as part of the

18  complaint, and thus may assume that its contents are true for purposes of a motion to dismiss

19  under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908.

20     **B.   Defendants' Request**

21     Defendants seek judicial notice of two documents that PG&E issued and CPUC approved

22  regarding the gas deregulation program: (1) Gas Schedule G-CT, Core Gas Aggregation Service;

23  and (2) Gas Rule No. 23, Gas Aggregation Service for Core Transport Customers. Dkt. No. 23 at

24  1 & Exs. A-B. Defendants contend that these documents are judicially noticeable because they are

25  "publicly available rules of and approved by a state regulatory agency" and, accordingly, are not

26  subject to reasonable dispute. Plaintiff admits that judicial notice of Gas Rule 23 is appropriate

27  because it referenced and relied upon the document in its complaint, but argues that Gas Schedule

28  G-CT is neither a public record nor relevant. Dkt. No. 30. Defendants reply that this rate schedule

9

is relevant because it governs the operations and service agreement that the parties executed and, in any case, was incorporated by reference into Plaintiff's complaint.  Dkt. No. 31.

The Court grants Defendants' request for judicial notice.  Plaintiffs agree that Gas Rule 23 is judicially noticeable because Plaintiff incorporated it by reference into the complaint.  *See* Compl. ¶¶ 31-33, 35, 176, 178-79 (discussing consolidated billing procedures and operations required by Gas Rule 23 in order to state breach of contract claim against PG&E); *see also Ritchie*, 342 F.3d at 908 (incorporation by reference proper where the complaint relies on the extrinsic materials referenced to state a claim).  And because Gas Schedule G-CT is a public record, the Court takes judicial notice on that basis.  *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 146 F. Supp. 3d 1122, 1133-34 & n.2. (N.D. Cal. 2015).

Defendants also offer the parties' operations and services agreement by attaching it to a declaration.  *See* Dkt. No. 22-1 & Ex. A.  While the Court can only consider materials within the four corners of the complaint and those subject to judicial notice at this stage, there is no dispute that the agreement is the one referenced in the complaint.  The Court construes Defendants' submission as a request for judicial notice and finds that the agreement is incorporated by reference into the complaint because Plaintiff relies on the agreement to state a claim for breach of contract.  *See Ritchie*, 342 F.3d at 908.

### C.    Plaintiff's Request

Plaintiff seeks judicial notice of several filings and a decision in a similar administrative proceeding before CPUC and an attachment to the parties' operations and services agreement. Dkt. No. 34.  Defendants respond that the filings and decision in a similar CPUC proceeding are irrelevant, as evidenced by the decision of another court in this district finding the lawsuit that flowed from that CPUC proceeding to be unrelated to the instant action.  Dkt. No. 37 at 1.

The Court grants in part and denies in part Plaintiff's request for judicial notice.  First, the filings from and the decision in a similar administrative proceeding before CPUC are not directly related to this action and, therefore, are not appropriate for judicial notice.  *See Tigueros*, 658 F.3d at 987.  But the Court will consider CPUC's decision for whatever persuasive value it may have. *See Diversified Capital Investments, Inc. v. Sprint Comm'ns, Inc.*, Case No. 15-cv-03796, 2016

WL298864, at *5 (N.D. Cal. May 24, 2016) (appropriate to decline judicial notice of other courts' orders but still consider their persuasive value).  Second, with respect to the attachment to the parties' operating and service agreement, the Court finds that judicial notice is appropriate.  The agreement was incorporated by reference into the complaint, as discussed above, because Plaintiff relies on it to assert breach of contract.  *See Ritchie*, 342 F.3d at 908.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  And even where facts are accepted as true, "a plaintiff may plead [him]self out of court" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 783, n.1 (9th Cir. 1997) (quotation marks and citation omitted).

## IV.    DISCUSSION

Defendants contend that Plaintiff's claims do not belong in federal court because CPUC has primary jurisdiction to hear its federal claims and exclusive jurisdiction to hear its state law claims.  At the least, Defendants argue the parties have contractually agreed to bring any dispute

1  regarding their operations and service agreement before CPUC.  Alternatively, in the event that

2  Plaintiff's claims are properly in federal court, Defendants move to dismiss them for failure to

3  plead those claims with particularity under Rule 9(b) and for failure to state a claim upon which

4  relief can be granted under Rule 12(b)(6).  The Court addresses each argument in turn.

5      **A.      Primary Jurisdiction Doctrine**

6          Defendants contend that CPUC has primary jurisdiction to hear Plaintiff's federal law

7  claims and, therefore, the Court should stay those claims pending an initial decision by CPUC.

8          "Primary jurisdiction is a prudential doctrine that permits courts to determine that an

9  otherwise cognizable claim implicates technical and policy questions that should be addressed in

10  the first instance by the agency with regulatory authority over the relevant industry rather than by

11  the judicial branch." *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 760 (9th Cir. 2015)

12  (quotation marks and citation omitted).  In evaluating primary jurisdiction, courts in the Ninth

13  Circuit consider: "(1) the need to resolve an issue that (2) has been placed by Congress within the

14  jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that

15  subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise

16  or uniformity in administration[.]" *Id.* (citation omitted).  But "[n]ot every case that implicates the

17  expertise of federal agencies warrants invocation of primary jurisdiction.  Rather, the doctrine is

18  reserved for a limited set of circumstances that requires resolution of an issue of first impression,

19  or of a particularly complicated issue that Congress has committed to a regulatory agency." *Id.*

20  (quotation marks and citation omitted).  And "even when agency expertise would be helpful, a

21  court should not invoke primary jurisdiction when the agency is aware of but has expressed no

22  interest in the subject matter of the litigation." *Id.* at 761.  Finally, "courts must also consider

23  whether invoking primary jurisdiction would needlessly delay the resolution of claims." *Id.*

24  (citations omitted); *see also Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1165 (9th Cir. 2007)

25  ("efficiency" is the "deciding factor" when considering primary jurisdiction).

26          Applying this standard, the Court finds that the primary jurisdiction doctrine does not

27  support a stay of Plaintiff's federal claims.  As an initial matter, the Ninth Circuit has expressed

28  some doubt as to whether federal courts are permitted to defer primary jurisdiction to state

United States District Court
Northern District of California

United States District Court
Northern District of California

agencies absent congressional authorization.  *See Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 n.12 (9th Cir. 1996) ("We note in passing that we are not entirely persuaded that the doctrine should be applied . . . to allow a federal court to 'route' issues to a state agency for resolution.") (citing *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1363 n.13 (9th Cir. 1987) ("[T]he primary jurisdiction doctrine is in effect, a power-allocating mechanism, [which] a court must not employ [] unless the particular division of power was intended by Congress.")); *see also W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1200-03 (9th Cir. 2008) (state public utilities commission had primary jurisdiction over federal claim only because Congress explicitly delegated authority to it through legislation).  Perhaps as a result, the Ninth Circuit's primary jurisdiction test, as recently set forth in *Astiana*, focuses on whether Congress placed an issue within an agency's jurisdiction by statute.  *See* 783 F.3d at 760.

Defendants argue that it is "somewhat an open question" whether courts in this circuit can refer issues to a state agency without congressional authorization, and point to several authorities they claim found such a referral proper.  But each of those cases, save one, involved a congressional delegation of authority by statute to either a federal or state agency.  *See Price v. Trans World Airlines, Inc.*, 481 F.2d 844, 848 (9th Cir. 1973) (federal Civil Aeronautics Board had primary jurisdiction under Federal Aviation Act); *PNG Telecomm., Inc. v. Pac-West Telecomm., Inc.*, No. Civ. S-10-1164, 2010 WL 3186195, at * (E.D. Cal. Aug. 11, 2010) (state public utilities commission had primary jurisdiction under Federal Telecommunications Act); *Meditech Int'l Co. v. Minigrip, Inc.*, 648 F. Supp. 1488, 1493 (N.D. Ill. 1986) (federal International Trade Commission had primary, if not exclusive, jurisdiction under Tariff Act of 1930).  It is true that the Ninth Circuit found primary jurisdiction in favor of a state agency without a congressional delegation of regulatory authority acceptable in one case.  *See Indus. Comm'ns Sys., Inc. v. Pac. Tel. & Tel. Co.*, 505 F.2d 152, 155-59 (9th Cir. 1974).  But the Ninth Circuit disapproved of that holding in a much more recent opinion.  *See Cost Mgmt.*, 99 F.3d at 949 n.12 (citing *General Dynamics*, 828 F.2d at 1363 n.13).  Given this clear trend in authority, the Court is disinclined to find that a state agency can have primary jurisdiction over a plaintiff's federal claims without Congress vesting in it some degree of regulatory authority.

Perhaps recognizing this trend, Defendants also claim that Congress delegated regulatory authority to CPUC over natural gas markets under the Natural Gas Act, 15 U.S.C § 717, *et seq*. But that statute applies only to wholesale gas distribution and specifically exempts retail gas distribution.  15 U.S.C. § 717(c); *S. Coast Air Qual. Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1090-91 (9th Cir. 2010) ("[T]he Natural Gas Act specifically exempted from federal regulation the 'local distribution of natural gas' *i.e.*, the means by which end users obtain their gas.").  Because this case exclusively involves retail natural gas distribution, the Natural Gas Act provides CPUC with no regulatory authority that could enable primary jurisdiction.  And no one disputes that neither the RICO Act nor the Sherman Act delegates any regulatory authority to CPUC.  *United Energy*, 146 F. Supp. 3d at 1134-35 ("[N]either RICO nor the Sherman Act implicate regulatory authority Congress placed within the specific jurisdiction of the CPUC.").

Because there is no evidence in the record that Congress has delegated any relevant authority to CPUC, the Court denies Defendants' request to stay Plaintiff's federal claims in favor of CPUC proceedings under the primary jurisdiction doctrine.[3]

### B.        Exclusive Jurisdiction Doctrine

Next, Defendants move to dismiss Plaintiff's state law claims on the grounds that CPUC has exclusive jurisdiction to hear those claims under California Public Utilities Code § 1759(a).

Section 1759(a) provides that: "No court of this state, except the Supreme Court and the court of appeal . . . shall have jurisdiction to review, reverse, correct, or annul any order or decision of [CPUC] or to suspend or delay the execution or operation thereof, or to enjoin,

---

[3] Even if federal courts could refer federal claims to a state agency without statutory delegation in some instances, there is no evidence that CPUC has superior, or even any, technical expertise regarding the federal claims at issue in this case.  As another court in this district noted in a case alleging identical RICO Act and Sherman Act claims, "PG&E has not identified any issue that requires [CPUC's] technical expertise to resolve, much less any question of first impression." *Id.* In fact, as Plaintiff notes, in the agency proceeding between the parties in the *United Energy* case, CPUC acknowledged its lack of experience in adjudicating these types of claims. *See* Dkt. No. 34, Ex. 4 ("[B]ecause [the plaintiff] has now introduced allegations of tortious and criminal conduct into this dispute, it has spilled over the jurisdictional limits of [CPUC] . . . [and] raise[s] potential substantive and procedural issues under federal law with which administrative law judges have little or no experience and may result in calls for procedures or remedies that [CPUC] cannot provide.").  And the fact that CPUC "is aware of but has expressed no interest in the subject matter" of these types of claims is yet another reason to decline referral to CPUC. *See Astiana*, 783 F.3d at 760.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    restrain, or interfere with [CPUC] in the performance of its official duties[.]"  At the same time,

2    however, public utilities are still subject to California law and may be sued by private litigants.  *Id.*

3    § 2106 ("Any public utility which does . . . any act . . . declared unlawful . . . by the Constitution,

4    any law of this State, or any order or decision of the commission, shall be liable . . . for all loss,

5    damages, or injury caused thereby . . . An action to recover for such loss, damage, or injury may

6    be brought in any court of competent jurisdiction[.]").

7         In *San Diego Gas & Electric Co. v. Superior Court (Covalt)*, 13 Cal. 4th 893 (1996), the

8    California Supreme Court substantially reconciled the apparent tension between these two statutes

9    on the question of when California trial courts can exercise jurisdiction over lawsuits brought

10   against public utilities without impinging on CPUC's regulatory authority.  In *Covalt*, the

11   California Supreme Court explained that § 1759 has "primacy" over § 2106, with the effect that

12   actions permitted by § 2106 must "be construed as *limited* to those situations in which an award of

13   damages would not hinder or frustrate the commission's declared supervisory and regulatory

14   policies."  *Id.* at 917 (emphasis original).  Therefore, to determine whether an action is barred by §

15   1759, courts ask: (1) whether CPUC had the authority to adopt a regulatory policy on the subject

16   matter of the litigation; (2) whether CPUC has exercised that authority; and (3) whether action in

17   the case before the court would hinder or interfere with CPUC's exercise of regulatory authority.

18   *Kairy v. SuperShuttle Int'l*, 660 F.3d 1146, 1150 (9th Cir. 2011).  As the California Court of

19   Appeal has summarized:

20        Section 1759 defines and limits the power of courts to pass
          judgment on, or interfere with, what the commission does.  Section

21        2106, on the other hand, confirms the full power of the courts to
          pass judgment on what utilities do.

22   *Cundiff v. GTE California Inc.*, 101 Cal. App. 4th 1395, 1406 (2002).

23        Applying the *Covalt* test, the Court finds that CPUC does not have exclusive jurisdiction

24   over Plaintiff's state law claims, with the exception of one injunctive relief claim.  The Court first

25   considers whether the scope of CPUC's regulatory authority overlaps with the subject matter of

26   Plaintiff's state law claims.  The California Constitution grants CPUC the broad authority to "fix

27   rates, establish rules . . . and prescribe a uniform system of accounts" over public utilities, which

28   include "[p]rivate corporations . . . that own, operate, control or manage . . . the . . . transmission,

or furnishing of heat . . . directly or indirectly to or for the public[.]" Cal. Const., Art. XII §§ 3, 6. The California legislature has also exercised its "plenary power . . . to confer additional authority and jurisdiction upon [CPUC]" under the California Constitution by enacting the Public Utilities Code, which grants CPUC the power to "do all things, whether specifically designated in [the Code] or in addition thereto, which are necessary and convenient" to regulate public utilities. *Id.*, Art. XIII § 5; Cal. Pub. Util. Code § 701; *Covalt*, 13 Cal. 4th at 915. Accordingly, for the purpose of a *Covalt* analysis, CPUC's authority has been "liberally construed." *See* 13 Cal. 4th at 915.

Defendants characterize Plaintiff's state law claims as billing disputes between CPUC-regulated entities that are thus subject to CPUC regulation. MTD Reply at 11. Whether this claim is accurate in every particular, CPUC has broad authority to "establish rules" and "prescribe a uniform system of accounts" over direct and indirect furnishers of natural gas to the public, which includes regulating PG&E's optional consolidated billing program for CTAs. *See Sarale v. Pac. Gas. & Elec. Co.*, 189 Cal. App. 4th 225, 239 (2010) ("For purposes of applying the *Covalt* test, it does not matter whether we characterize [CPUC's] actions broadly . . . or narrowly . . . What matters is that [CPUC] has exercised its authority to adopt a regulatory policy relating to [the subject matter of the litigation]—regardless of how that policy may be characterized."). For that reason, the Court finds that CPUC has the authority to regulate the subject matter of this action.

Under the second step of the *Covalt* test, the Court must determine whether CPUC actually exercised the regulatory authority identified in the previous step. Defendants contend that CPUC did so, at a minimum, by approving and publishing Gas Rule 23.[4] Gas Rule 23, in relevant part, discusses the framework for the optional consolidated billing program for CTAs. Dkt. 23, Ex. B at 28-40. Specifically, it provides rules on transmitting EDIs to CTAs, rate structures, payment

---

[4] Within CPUC's lexicon, Gas Rule 23 is a "tariff rule": "Tariffs and tariff rules are authorized pursuant to [California Public Utilities Code] section 489, subdivision (a), which provides: 'The commission shall, by rule or order, require every public utility . . . to file with [CPUC] . . . and to print and keep open to public inspection, schedules showing all rates, tolls, rentals, charges, and classifications collected or enforced, or to be collected or enforced, together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service[.]'" *Davis v. S. Cal. Edison Co.*, 236 Cal. App. 4th 619, 623 n.6 (2015) (citation omitted). Tariffs and tariff rules that have been published and approved by CPUC have "the force . . . of a statute." *Id.* at 622, n.1 (citation omitted).

United States District Court
Northern District of California

1    calculations, and customer collections.  *Id.*  Accordingly, the Court finds that Gas Rule 23 is an

2    exercise of CPUC's authority to regulate billing practices between public utilities and CTAs.  *See*

3    *Davis*, 236 Cal. App. 4th at 625, 642 (finding that CPUC exercised its regulatory authority for

4    *Covalt* purposes by approving a regulated utility's tariff rules).

5            The third and most important component of the *Covalt* inquiry is whether Plaintiff's state

6    law claims would "hinder or interfere with" CPUC's exercise of regulatory authority.  Plaintiff

7    contends that Defendants "fail to identify even one Gas Rule implicated by this action, much less

8    state how it would require interpretation or explain how such interpretation would interfere with

9    Commission policy."  MTD Opp. at 9.  Plaintiff further contends that there is no risk of hindering

10   or interfering with CPUC's exercise of regulatory authority because it does not seek any injunctive

11   relief against Defendants, only damages.  *Id.* at 10.  Defendants respond that adjudication of the

12   state law claims would hinder or interfere with CPUC's jurisdiction because they "require the

13   Court to determine the correct application and interpretation of Gas Rule 23, and if the Court were

14   to do so, it would hinder the CPUC's exclusive right to interpret its own rules."  Reply at 11.

15           To begin, Plaintiff's claim that Defendants have not identified a Gas Rule implicated by

16   this action is plainly wrong: its breach of contract cause of action is entirely based on Defendants'

17   alleged "fail[ure] to provide billing and collection services in accordance with the provisions of

18   Gas Rule 23."  Compl. ¶ 178; *see also id.* ¶¶ 176-79.  Plaintiff's breach of fiduciary duty and

19   conversion causes of action also reference and rely on duties derived from Gas Rule 23 and

20   incorporated into the parties' agreement.  *See id.* ¶¶ 129-135, 152-154.  The more germane (and

21   more complicated) question is whether a ruling on any or all of Plaintiff's state law claims would

22   necessarily intrude on the CPUC's performance of its official duties.  Having closely examined the

23   key case law relevant to this question, the Court concludes, with one exception, that it would not.

24           The California Supreme Court analyzed a similar situation in depth in *Hartwell Corp. v.*

25   *Superior Court (Santamaria)*, 27 Cal. 4th 256 (2002).[5]  The *Hartwell* plaintiffs were Southern

26   California residents who filed several parallel actions in state court against regulated utility water

27   

28   [5] Oddly, Defendants did not cite *Hartwell*, the most directly on-point California Supreme Court
     case, in their motion.  Nor did they respond in their reply to Plaintiff's discussion of the case.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  providers, among other related entities, for providing unsafe drinking water that resulted in death,

2  personal injury, and property damage.  *Id.* at 260.  The plaintiffs alleged various California causes

3  of action, including negligence, strict liability, trespass, public and private nuisance, fraudulent

4  concealment, conspiracy, battery, and unfair business practices, though not breach of contract.  *Id.*

5  at 261.  Significantly, in doing so, the plaintiffs essentially challenged both the "adequacy" of

6  federal and state drinking water standards and "compliance" with those standards.  *Id.* at 276.  On

7  these bases, the plaintiffs sought both damages and injunctive relief.  *Id.* at 276, 279.

8          In response to the lawsuits, CPUC started an investigation to determine whether current

9  water standards adequately protected the public and whether the regulated utilities had historically

10  complied with those standards.  *Id.* at 262.  The plaintiffs intervened in the CPUC investigation

11  and sought to have it dismissed or limited for lack of jurisdiction.  *Id.*  CPUC rejected that view,

12  finding that it "possessed authority to regulate the quality of service and the drinking water that

13  the water utilities provide[.]"  *Id.*  Meanwhile, some of the utilities moved to dismiss the plaintiffs'

14  lawsuits on the ground that they were barred by § 1759.  *Id.* at 263.  One trial court sustained the

15  demurrers, and the plaintiffs appealed.  *Id.*  The California Court of Appeal ruled that CPUC's

16  "statutory authority over water quality and its exercise of jurisdiction in addressing water quality

17  issues preempted the four actions against the regulated utilities" under § 1759.  *Id.* at 263-64.

18          The California Supreme Court reversed the California Court of Appeal in part, reinstating

19  a number of the plaintiffs' claims for damages against the regulated utilities.  Applying the *Covalt*

20  test, the court first considered whether CPUC had the authority to regulate the subject matter of

21  the lawsuits by explaining the history of water regulation in California.  While CPUC had initially

22  promulgated rules to regulate water quality, they were preempted by federal legislation, which was

23  in turn supplemented by not-inconsistent state legislation.  *Id.* at 268-69.  Despite this legislative

24  occupation of the field of water standards, the court agreed with CPUC's investigatory decision

25  that it had "authority to set and enforce drinking water standards when regulating water providers"

26  under the California Constitution.  *Id.* at 269-72.  And under the second step of the *Covalt* test, the

27  court found that CPUC had in fact exercised its authority to regulate water quality.  *Id.* at 272-74.

28          The California Supreme Court then described the standard trial courts must apply when

18

1  conducting the determinative third step of the *Covalt* test: whether action in the case before the

2  court would hinder or interfere with CPUC's exercise of regulatory authority.  With respect to

3  actions seeking damages, the court began by explaining the general principle that:

4      [A]n award of damages is barred by section 1759 if it would be
       contrary to a policy adopted by the [CPUC] and would interfere with

5      its regulation of public utilities.  On the other hand, superior courts
       are not precluded from acting in aid of, rather than in derogation of,

6      the [CPUC's] jurisdiction.

7  *Id.* at 275 (internal citations omitted).  Illustrating one example of when courts act in aid of CPUC

8  jurisdiction, *Hartwell* said that "a court has jurisdiction to enforce a water utility's legal obligation

9  to comply with [CPUC] standards and policies and to award damages for violations."  *Id.* (citing

10  *Vila v. Tahoe Southside Water Utility*, 233 Cal. App. 2d 469, 479-80 (1965)).  And to further

11  distinguish permissible and impermissible damages actions, the court quoted from *Covalt*:

12     When the bar raised against a private damages action has been a
       ruling of [CPUC] on a single matter such as its approval of a tariff

13     or merger, the courts have tended to hold that the action would not
       "hinder" a "policy" of [CPUC] . . . But when the relief sought would

14     have interfered with a broad and continuing supervisory or
       regulatory program of the commission, the courts have found such a

15     hindrance and barred the action under section 1759.

16  *Id.* (citing 13 Cal. 4th at 918-19).

17      Applying these principles, the court barred the plaintiffs' damages claim challenging the

18  adequacy of the state water quality standards because it would necessarily call CPUC regulations

19  relying on that benchmark into question.  *Id.* at 276.  For that reason, adjudication of that claim

20  would "interfere with a broad and continuing supervisory or regulatory program" of CPUC.  *Id.* at

21  276-78 (internal quotation marks and citation omitted).  Similarly, the court found the plaintiffs'

22  request for a permanent injunction to enforce compliance with water quality standards barred.  *Id.*

23  at 278-79.  But the court allowed the plaintiffs to pursue damages claims based on the theory that

24  water quality failed to meet federal and state drinking standards, because "a jury award based on a

25  finding that a public water utility violated [state agency] standards would not interfere with the

26  [CPUC] regulatory policy requiring water utility compliance with those standards."  *Id.* at 276.

27  Despite the fact that CPUC had found in its investigation that the water utilities had substantially

28  complied with water quality regulations, the court explained that "[b]ecause [CPUC] cannot

United States District Court
Northern District of California

19

United States District Court
Northern District of California

provide [] relief for past violations, those damage actions would not interfere with the PUC in implementing its supervisory and regulatory policies to prevent future harm." *Id.* at 277.

*Vila v. Tahoe Southside Water Utility*, the key case relied upon by the California Supreme Court in *Hartwell*, is also instructive.  In that case, the plaintiff owned an office building within the area serviced by the defendant water utility.  233 Cal. App. 2d at 470.  The applicable CPUC tariff provided that water service to multiple units on the same premises could be provided either by "separate service connections" or through a "single service connection," at the election of the property owner. *Id.* at 471-72.  The defendant refused to provide a single service connection, so the plaintiff sued for an injunction requiring defendant to do so and sought compensatory and exemplary damages on that basis. *Id.* at 470.  The defendant successfully moved in the trial court to dismiss based on § 1759, but the Court of Appeal reversed. *Id.* at 474.  The court reasoned that the CPUC tariff unambiguously required the defendant to provide the single service connection at the water user's option and found that there was "an order by [CPUC] already in effect directing the utility to carry out the undertakings contained in the schedule." *Id.* at 474.  The court therefore found that the trial court had jurisdiction to hear all claims, because exercise of that jurisdiction to enforce an obligation imposed on the utility by "an unambiguous provision in [CPUC's] own rules" was "in aid and not in derogation of the jurisdiction of the [CPUC]." *Id.* at 479.

The California Court of Appeal has since applied both *Hartwell* and *Vila* in a case that bears strong parallels to this one, *Cundiff v. GTE California Inc.*, 101 Cal. App. 4th 1395 (2002). The plaintiffs sued regulated telephone utilities for charging them an "equipment rental" fee for "obsolete" or nonexistent phones. *Id.* at 1400-02.  They asserted claims under California's unfair competition law, false advertising law, and consumer fraud and negligent misrepresentation statute seeking damages, declaratory, and injunctive relief. *Id.* at 1402.  The defendants demurred on the grounds that § 1759 blocked the suit, pointing to telecommunication consumer protection rules on accurate billing practices that CPUC had promulgated, and the trial court agreed. *Id.* at 1402-04. The California Court of Appeal reversed the decision and held that the plaintiffs could challenge the defendants' *billing practices*, notwithstanding CPUC's billing regulations, because the plaintiffs were not "challenging [CPUC's] decision to allow defendants to rent telephones to their

United States District Court
Northern District of California

customers," but were only "challenging the *manner* in which defendants billed them" under those regulations. *Id.* at 1406. In reaching that decision, the court relied on a pre-*Hartwell* case from the California Court of Appeal, *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1245 (1993), which held that § 1759 did not preclude an antitrust action for price-fixing under state law against cellular telephone companies, seeking both damages and injunctive relief, because "the plaintiffs did not challenge [CPUC's] right to set rates for cellular service, and did not seek to have the commission change its rates[.]" *Cundiff*, 101 Cal. App. 4th at 1407. *Cellular Plus* thus supported the rule that so long as a "suit actually furthers policies of [CPUC]," it is not barred. *Id.* at 1408.

Similarly, in *Nwabueze v. AT&T, Inc.*, No. C 09-1529, 2011 WL 332473, at * 16 (N.D. Cal. Jan. 29, 2011), a court in this district relied on *Hartwell* to find that the plaintiffs' state law claims for damages were not within the CPUC's exclusive jurisdiction. The plaintiffs sued regulated telecommunications providers for an allegedly unlawful "cramming" scheme, in which customers were charged for products and services they did not order. *Id.* at *1. The plaintiffs asserted a number of federal and state claims, including state law claims for breach of contract, tortious interference with contract, and unfair competition. *Id.* at *4. The defendants moved to dismiss on the ground that the state law claims were within the exclusive jurisdiction of the CPUC under § 1759. *Id.* at *12. After discussing *Hartwell* in detail, the court found that the plaintiffs' damages claims were not barred by § 1759, although its injunctive relief claims were. *Id.* at *16. The court held that "a lawsuit for damages based on past cramming violations would not interfere with any prospective regulatory program," since "a finding of liability would not be contrary to any policy adopted by the CPUC or otherwise interfere with the CPUC's regulation of telephone utilities." *Id.* For this reason, the plaintiffs' damages claims were not barred by § 1759.

Together, *Hartwell*, *Vila*, *Cundiff*, *Cellular Plus*, and *Nwabueze* make clear that California law permits courts to entertain actions for both damages and injunctive relief against regulated utilities where those actions seek to enforce, rather than challenge, obligations created by CPUC regulations. To further flesh out how to apply this principle, the Court also considers the cases in which courts have found actions properly barred by § 1759.

1      Two cases in which the California Court of Appeal held that actions for damages were

2   barred help to define the outer boundaries of § 1759.  First, in *Anchor Lighting v. Southern*

3   *California Edison Co.*, the California Court of Appeal held that a damages claim was barred

4   because it required the court to determine whether the plaintiff qualified for a utility rate discount

5   as a "small commercial customer" as set forth in the defendant utility's tariff.  142 Cal. App. 4th

6   541, 546-50 (2006).  The court explained that "[b]ecause [the] lawsuit would if successful modify

7   [the defendant utility's] application of the [] discount and its financing scheme, the interference

8   with the CPUC's ratemaking function is clear."  *Id.*  Second, in *Schell v. Southern California*

9   *Edison Co.*, the California Court of Appeal held that determining whether a recreational vehicle

10  park should be charged electricity rates applicable only to "mobilehome parks" under the

11  defendant utility's tariff was "within the exclusive purview of [CPUC] as part of its continuing

12  jurisdiction over rate making and rate regulation[.]"  204 Cal. App. 3d 1039, 1046 (1988).

13      *Anchor Lighting* and *Schell* therefore stand for the general principle that even where a

14  plaintiff seeks only to enforce a CPUC rule, the action is impermissible if its adjudication requires

15  courts to determine how, or even whether, an ambiguous CPUC rule applies, because this type of

16  determination is policymaking that would hinder or interfere with CPUC's exercise of its

17  jurisdiction.  *See Anchor Lighting*, 142 Cal. App. 4th at 546-50 (ambiguous term to be construed

18  was "small commercial customer"); *Schell*, 204 Cal. App. 3d at 1046 (ambiguous whether

19  recreational vehicle parks should be billed electric rates for mobilehome parks or some other

20  residential or commercial rate).  Conversely, if an action seeks to enforce a rule that clearly sets

21  out the nature of the obligation imposed, and both parties agree the rule controls the dispute,

22  simply deciding whether a defendant's actions did or did not violate that standard does not hinder

23  or interfere with the CPUC's jurisdiction, because doing so does not implicate any broad and

24  continuing supervisory or regulatory program.  *See Hartwell*, 27 Cal. 4th at 275.

25      In this case, none of Plaintiff's state law claims require the Court to construe ambiguous

26  provisions of Gas Rule 23, or decide policy questions like the ones at issue in *Anchor Lighting* and

27  *Schell*.  Plaintiff's breach of contract, breach of fiduciary duty, conversion, and unlawful

28  competition claims might require the Court to *enforce* Gas Rule 23 against PG&E, based on what

United States District Court
Northern District of California

22

Plaintiff alleges to be improper withholding of funds, but only in the same manner that the California courts found proper in *Hartwell, Vila*, *Cundiff*, and *Cellular Plus* and that this district found proper in *Nwabueze*.  The gravamen of Plaintiff's claims is that PG&E failed to remit funds owed to Plaintiff after Plaintiff's customers paid their consolidated PG&E bill, in violation of Gas Rule 23.C.1(c)(4)(a).  Compl. ¶ 178.  That rule provides: "PG&E is required to pay the CTA the amounts paid to PG&E for CTA charges only after the Customer's payment is received by PG&E."  Dkt. No. 23, Ex. B at 34.  This rule does not present a complex question of interpretation: it simply requires PG&E to pay Plaintiff what it was owed after its customers paid PG&E, as defined in the tariff.  Similarly, with respect to Plaintiff's breach of contract and fiduciary duty claims, Plaintiff also alleges that PG&E breached Gas Rule 23.C.1(c)(5)(a), which provides that "PG&E is responsible for collecting the unpaid balance of all charges from Customers, sending notices informing Customers of unpaid balances, and taking the appropriate actions to recover the unpaid amounts owed the CTA."  Compl. ¶ 179; Dkt. No. 23, Ex. B at 35. Again, nothing about those claims requires complex interpretation of Gas Rule 23, under which PG&E is required to collect unpaid balances from Plaintiff's customers.

Additionally, Plaintiff's state law claims for intentional and negligent misrepresentation and intentional interference with contractual relations and prospective business advantage would not require the Court even to enforce Gas Rule 23.  Those claims are based on allegedly false statements PG&E made to Plaintiff and its customers, the truth of which will not be determined by referencing any CPUC regulation.  *See* Compl. ¶¶ 156-73; *see also Kairy*, 660 F.3d at 1156 (holding that there is no impediment under the third prong of *Covalt* where the legal test is a "distinct inquiry from the one that would be made by [CPUC] in a regulatory proceeding").

The only aspect of Plaintiff's complaint that the Court finds would hinder or interfere with CPUC's exclusive jurisdiction is its request for injunctive relief under its unfair competition claim. While that claim permissibly seeks restitution for the funds from Plaintiff's customers that PG&E allegedly withheld, it also seeks "injunctive relief to prevent PG&E's continued wrongful actions under California Business and Professions Code § 17202."  Compl. ¶ 185-87.  Section 17202 provides that "specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal

United States District Court
Northern District of California

1    law in a case of unfair competition." Cal. Bus. & Prof. Code § 17202. An injunction that

2    prospectively regulates PG&E's conduct is impermissible under these facts. *See Hartwell*, 27 Cal.

3    4th at 276-78; *Nwabueze*, 2011 WL 332473, at **4, 16. Accordingly, Plaintiff's request for

4    injunctive relief under its unfair competition claim is barred by § 1759.

5         The authority that Defendants cite in support of their position that § 1759 bars this entire

6    action does not change the Court's conclusion. For example, in *Davis v. Southern California*

7    *Edison Co.*, 236 Cal. App. 4th 619, 622-23 (2015), the primary case upon which Defendants rely,

8    the plaintiff, who was proceeding pro se, alleged that the regulated utility defendant violated

9    several of its tariff rules in failing to properly process his applications to connect residential solar

10   generating facilities to the utility's electricity grid. The defendant utility demurred on the ground

11   that § 1759 barred the complaint, but also because the tariff included an "initial jurisdiction"

12   provision stating that "[CPUC] shall have initial jurisdiction to interpret, add, delete or modify any

13   provision of this Rule or of any agreements entered into between Distribution Provider and

14   Applicant or Producer to implement this tariff . . . and to resolve disputes regarding the

15   Distribution Provider's performance of its obligations under [CPUC]-jurisdictional tariffs[.]" *Id.*

16   at 633. This provision, the defendant argued, revoked the court's subject matter jurisdiction until

17   CPUC had ruled on the myriad of interpretation issues set forth in the complaint. *Id.* at 633. The

18   trial court agreed on both counts, sustaining the defendant's demurrer without leave to amend but

19   also without prejudice to refiling once CPUC had exercised its initial jurisdiction. *Id.*

20        The California Court of Appeal affirmed. While the court applied the *Covalt* analysis to

21   conclude that the action was barred by § 1759, as discussed further below, it also appeared to hold

22   that the plaintiff's claims were unripe in light of the initial jurisdiction provision. *Id.* at 644-45

23   ("If [the plaintiff] received a favorable ruling from [CPUC] but seeks relief beyond the equitable

24   remedies available to [CPUC], he will at that time have 'ripe' claims to be filed in the superior

25   court."). This does not sound like a finding that the action was barred by § 1759: instead, it is

26   more like a referral to a state agency under the primary jurisdiction doctrine discussed above.

27   Because the Court cannot say that this issue was not dispositive, the Court views *Davis* as less

28   persuasive than *Hartwell* and the other § 1759 authorities discussed above.

United States District Court
Northern District of California

1    In addition, the *Davis* court's approach largely squares with the Court's analysis in this

2    case.  In evaluating the defendant's exclusive jurisdiction argument, *Davis* applied *Anchor*

3    *Lighting* and *Schell* to hold that the plaintiff's damages claims were barred by § 1759 because all

4    but one of them required the court to construe clearly complex and policy-related aspects of

5    CPUC's regulations.  236 Cal. App. 4th at 642-44 (explaining that the action would require the

6    court to construe (1) the sizing requirement for solar generating systems, (2) whether the

7    plaintiff's solar facilities were "exporting" or "non-exporting" facilities (a fact that controlled

8    which of two deadlines applied), (3) whether the plaintiff's solar facilities were an

9    "interconnection" or a "distribution facility," and (4) whether a third party's attempt to avoid a

10   size limitation on its solar facilities constituted improper "daisy chaining").

11         *Davis* did find that determining whether the defendant complied with provisions of the

12   tariff requiring it to take certain actions within a given number of days would require

13   interpretation of concepts such as when an application was "deemed complete" or whether any

14   exceptions applied.  *Id.* at 643.  Specifically, the court found that "the complexity of the

15   determination of whether [defendant utility] has violated the deadlines" was significant in

16   concluding that § 1759 barred the claim.  *Id.*  But, for the reasons explained above, the Court finds

17   that this case does not involve complex interpretive challenges.  Nor would a damages finding as

18   to any of Plaintiff's claims here hinder or impede any policy adopted by the CPUC.

19         In sum, the Court denies Defendants' motion to dismiss Plaintiff's state law claims under

20   the exclusive jurisdiction doctrine set forth in California Public Utilities Code § 1759(a) with the

21   exception of the injunctive relief that Plaintiff requests under its unfair competition claim.

22         **C.      Forum Selection Clause**

23         Defendants next argue that the parties' operations and services agreement contains a forum

24   selection clause that contractually requires Plaintiff's claims to be adjudicated before CPUC.

25   MTD at 9-10.  The clause provides: "Complaints against [PG&E] arising out of this Agreement

26   shall be enforced only under the provisions of Section 1702 of the Public Utilities Code."  Dkt.

27   No. 22-1, Ex. A at 9.  California Public Utilities Code § 1702 states: "Complaint may be made . . .

28   by any corporation . . . setting forth any act or thing done or omitted to be done by any public

United States District Court
Northern District of California

1    utility . . . in violation or claimed to be in violation, of any provision of law or of any order or rule

2    of the commission."  Plaintiff argues that enforcement of the forum selection clause would effect

3    an unlawful waiver of its intentional tort and statutory claims under California Civil Code § 1668.

4        As an initial matter, the Court must determine which of Plaintiff's claims falls within the

5    scope of the forum selection clause.  Federal law controls the issue.  *Doe 1 v. AOL LLC*, 552 F.3d

6    1077, 1081 (9th Cir. 2009).  The Ninth Circuit has held that the language "arising out of this

7    Agreement," as opposed to "arising out of or relating to," "narrowly circumscribes" the scope of

8    forum selection clauses.  *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 921-23 (9th

9    Cir. 2011) (discussing *Tracer Research Corp. v. Nat'l Environmental Servs. Co.*, 42 F.3d 1292,

10   1295 (9th Cir. 1994) and *Mediterranean Enters., Inc. v. Ssanyong Corp.*, 708 F.2d 1458, 1463-64

11   (9th Cir. 1983)).  As a result, "only those [claims] relating to the interpretation and performance

12   of the contract itself" are subject to the provision.  *Id.* at 922 (quoting *Mediterranean*, 708 F.2d at

13   1464).  In other words, any tort claims that constitute an "independent wrong from any breach" of

14   the underlying agreement should not be dismissed.  *Id.* (quoting *Tracer*, 42 F.3d at 1295).

15       Applying this standard, the Court finds that the forum selection clause in this case wholly

16   encompasses Plaintiff's claims for breach of contract and conversion.  Those claims, alleging that

17   PG&E has withheld money owed to Plaintiff under the agreement, Compl. ¶¶ 151-55, 174-181,

18   are claims relating to contractual interpretation and performance, *see Mediterranean*, 708 F.2d at

19   1464 (breach of contract and conversion claims within scope).  Similarly, to the extent that

20   Plaintiff's claims for breach of fiduciary duty and unfair competition, *see* Compl. ¶¶ 133, 185, are

21   predicated on the same allegation, they are also within the forum selection clause, *Mediterranean*,

22   708 F.2d at 1464.  The remainder of Plaintiff's claims, however, are independent torts.  *See Cape*

23   *Flattery*, 647 F.3d at 923-24 (statutory torts are independent of the contract); *Mediterranean*, 708

24   F.3d at 1464 (same for third-party contract claims, including contractual interference).

25       The Court next addresses Plaintiff's argument that enforcing the forum selection clause

26   would constitute an unlawful waiver under California law.  Federal law controls whether a forum

27   selection clause is enforceable.  *Doe 1*, 552 F.3d at 1083.  "A forum selection is presumptively

28   valid; the party seeking to avoid a forum selection clause bears a 'heavy burden' to establish a

26

1    ground upon which [a federal court] will conclude the clause is unenforceable." *Id.* (quoting *M/S*

2    *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17 (1972)).  Under *Bremen*, a forum selection clause

3    is unenforceable "if enforcement would contravene a strong public policy of the forum in which

4    suit is brought, whether declared by statute or by judicial decision." *Bremen*, 407 U.S. at 15.

5          To that effect, California Civil Code § 1668 provides: "All contracts which have for their

6    object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful

7    injury to the person or property of another, or violation of law, whether willful or negligent, are

8    against the policy of the law."  This provision applies to limitations on liability, not just

9    exemptions from liability.  *FiTeq Inc. v. Venture Corp.*, — F. Supp. 3d —, 2016 WL 948941, at

10   *4 (N.D. Cal. 2016).  The key question is whether compelling Plaintiff to seek relief before CPUC

11   on the claims within the scope of the forum selection clause would have the effect of improperly

12   limiting PG&E's liability for intentional wrongs and statutory violations.  The answer turns on the

13   remedies that are available in a CPUC proceeding.  To the extent that Plaintiff would not be able

14   to recover for its injuries before CPUC, the forum selection clause would operate as an

15   unenforceable waiver because it would have the indirect effect of exempting PG&E from certain

16   liability.

17         With this framework in mind, the Court finds that compelling Plaintiff to proceed before

18   CPUC on its breach of fiduciary duty and unfair competition claims would contravene California's

19   public policy against permitting contracting parties to limit their liability for intentional torts and

20   statutory violations.  The remedies available in a CPUC proceeding include penalties, contempt,

21   injunction, and mandamus, *Hartwell*, 27 Cal. 4th at 277, but CPUC cannot award damages to

22   persons harmed by the conduct of a utility, *Davis*, 236 Cal. App. 4th at 636.  CPUC does have the

23   authority to order reparations, but only for utility rates charged that are unreasonable, excessive, or

24   discriminatory.  *Davis*, 236 Cal. App. 4th at 636.  For that reason, the California Court of Appeals

25   has held that CPUC cannot hear breach of fiduciary duty and unfair competition claims because

26   CPUC cannot award sufficient remedies.  *Neubauer v. Goldfarb*, 108 Cal. App. 4th 47, 56 (2003)

27   (breach of fiduciary duty claims); *Greenlining Inst. v. Pub. Util. Comm'n*, 103 Cal. App. 4th 1324

28   (2002) (unfair competition claims).  Forcing Plaintiff to proceed before CPUC would therefore

United States District Court
Northern District of California

serve as an indirect exemption from liability for PG&E, and the Court finds it unenforceable as to those claims. But Plaintiff's claims for breach of contract and conversion do not fall within the scope of California Civil Code § 1668 because they are not intentional wrongs or statutory claims.

Accordingly, the Court dismisses Plaintiff's claims for breach of contract and conversion.[6] If CPUC refuses jurisdiction, however, Plaintiff may return to this Court to seek appropriate relief.

### D.     Special Damages Waiver

Relatedly, Defendants point out that the agreement between PG&E and Plaintiff contained a special damages waiver. That provision provides that: "No Party under this Agreement shall be assessed any special, punitive, consequential, incidental, or indirect damages, whether in contract or tort (including negligence) or otherwise, for any breach, actions or inactions arising from, out of, or related to this Agreement." Dkt. No. 22-1, Ex. A at 8. Plaintiffs respond again that the anti-waiver policy set forth in California Civil Code § 1668 bars these limitations on liability.

Regarding Plaintiff's state law claims, California law recognizes the validity of certain contractual limitations on liability.[7] "With respect to claims for breach of contract, limitation of liability clauses are enforceable unless they are unconscionable[.]" *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (2012). "However, limitation of liability clauses are ineffective with respect to claims for fraud and misrepresentation." *Id.* Whether limitations on liability for negligence are enforceable depends on the language of the contract and an evaluation of the public's interests. "For an agreement to be construed as precluding liability for 'active' or 'affirmative' negligence, there must be express and unequivocal language in the agreement which precludes such liability. An agreement which seeks to limit generally without mentioning negligence is construed to shield a party only for passive negligence, not for active negligence." *Burnett v. Chimney Sweep*, 123 Cal. App. 4th 1057, 1066 (2004) (quotation marks and citation omitted).

In this case, the Court finds that the special damages waiver is unenforceable with respect

---

[6] At oral argument, Plaintiff's counsel confirmed that Plaintiff intends to dismiss the breach of contract claim. Dkt. No. 45 at 4.
[7] Defendants only contend that the special damages waiver applies to Plaintiff's state law claims, so the Court does not consider whether it applies to Plaintiff's federal law claims.

United States District Court
Northern District of California

to Plaintiff's claims for unfair competition, breach of fiduciary duty, intentional misrepresentation, intentional interference with contractual relations, and intentional interference with prospective business advantage.  Each of those claims involves a willful or statutory injury within the meaning of California Civil Code § 1688.  But, because the special damages waiver explicitly includes "negligence" claims within its scope, the Court finds that the special damages waiver applies to Plaintiff's negligent misrepresentation claim, despite the fact that it alleges "active" negligence. *See Peregrine Pharms., Inc. v. Clinical Supplies Mgmt., Inc.*, No. SACV 12-1608, 2014 WL 3791567, at \*\*11-12 (C.D. Cal. Jul. 31, 2014).  Accordingly, the Court dismisses Plaintiff's prayer for exemplary and punitive damages for negligent misrepresentation.  *See* Compl. ¶ 150(b).

### E.      Failure to Plead Fraud Claims with Particularity

Defendants contend that each of Plaintiff's claims sound in fraud but were not pled with the particularity required by Federal Rule of Civil Procedure 9(b).  MTD at 11 ("[Plaintiff] fails to allege specific misrepresentations on the part of PG&E, instead offering examples of possible misstatements.").  With the exception of Plaintiff's civil RICO claim, however, Defendants do not specify which claims are inadequately pled under Rule 9(b), or why that is the case. The Court is not required to sift through the complaint to identify purportedly inadequate allegations when the moving party has not done so.  Accordingly, the Court limits its analysis to the specific issues identified in Defendants' motion, as discussed below.

### F.      Failure to State a Claim Upon Which Relief Can Be Granted

Finally, Defendants contend that Plaintiff has failed to state a claim upon which relief can be granted under Rule 12(b)(6) with respect to its claims for violation of the RICO Act and the Sherman Act, breach of fiduciary duty, intentional and negligent misrepresentation, conversion, intentional inference with contract, intentional interference with prospective business advantage, breach of contract, and unfair competition.  The Court does not consider Defendants' argument with respect to conversion and breach of contract, as those claims already have been dismissed.[8]

---

[8] In its reply brief, PG&E raises for the first time the argument that Plaintiff failed to adequately allege respondeat superior liability.  MTD Reply at 12.  The Court will not consider arguments raised for the first time on reply where it would prejudice the opposing party.  *See Cedano–Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003).  Because Plaintiff had no opportunity to

United States District Court
Northern District of California

1

                    1.      Civil RICO Claims

2          18 U.S.C. § 1962(c), one of the substantive provisions of the RICO Act, provides that: "It

3  shall be unlawful for any person employed by or associated with any enterprise engaged in, or the

4  activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

5  indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"

6  To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3)

7  through a pattern (4) of racketeering activity." *Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479,

8  496 (1985).  It is unlawful for any person to conspire to violate § 1962(c).  18 U.S.C. § 1962(d).

9          Plaintiff alleges that the Individual Defendants violated § 1962(c) by associating together

10  to operate the Consolidated Billing department within PG&E as a separate racketeering enterprise.

11  Compl. ¶¶ 33, 92.  In their capacity as the Consolidated Billing enterprise, Plaintiff claims that the

12  Individual Defendants committed numerous acts of wire fraud, the predicate acts required to show

13  a pattern of racketeering activity, by making fraudulent statements to Plaintiff and its customers in

14  EDIs and calls.  *Id.* ¶¶ 85-90.  Defendants move to dismiss this claim on the grounds that: (1) the

15  Consolidated Billing department cannot qualify as a RICO enterprise because it is indistinct from

16  PG&E; (2) there is no "pattern of racketeering activity" alleged because Plaintiff has not tied any

17  of the Individual Defendants to the alleged predicate acts of wire fraud; and (3) the predicate acts

18  of wire fraud are insufficiently pled.  The Court addresses each of these arguments in turn.

19                    a)      *Enterprise*

20          A RICO "enterprise" is "any individual, partnership, corporation, association, or other

21  legal entity, and any union or group of individuals associated in fact although not a legal entity."

22  18 U.S.C. § 1961(4).  In this case, Plaintiff alleges that the Consolidated Billing enterprise, which

23  consists of the Individual Defendants, is a group of individuals associated in fact.  Compl. ¶ 92.

24          For the purposes of the RICO Act, "an associated-in-fact enterprise is a group of persons

25  associated together for a common purpose of engaging in a course of conduct."  *United States v.*

26  _____

27  address the issue, the Court does not consider Defendants' argument on respondeat superior
   liability.  However, in any event, at oral argument, Plaintiff's counsel acknowledged that its
28  respondeat superior allegations must be pled with greater specificity.  Dkt. No. 45 at 4.
   Accordingly, that cause of action is dismissed with leave to amend.

United States District Court
Northern District of California

*Turkette*, 452 U.S. 576, 583 (1981).  "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).  In the Ninth Circuit, "[t]o establish the existence of such an enterprise, a plaintiff must provide both evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (en banc).  Some circuits require that there be "an ascertainable organizational structure beyond whatever structure is required to engage in the pattern of illegal racketeering activity," but, in the Ninth Circuit, "an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise."  *Id.* at 551.  With that said, an associated-in-fact enterprise must still be conceptually "distinct" from the RICO persons identified as conducting the RICO enterprise.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.") (quoting 18 U.S.C. § 1962(c)); *accord Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  This means that "the person and the tool[] are different entities, not the same."  *Cedric Kushner*, 533 U.S. at 162.

Defendants move to dismiss on the basis that Consolidated Billing cannot be considered a distinct enterprise from either the Individual Defendants or PG&E because all are one and the same.  MTD at 12-13.  If the Individual Defendants are simply PG&E's employees, acting in the course of their employment as its agents, then, Defendants contend, PG&E is both the RICO person and the RICO enterprise, impermissibly collapsing the required distinctiveness between the two.  Plaintiff responds that it is not alleging that the Individual Defendants are acting within the scope of their authority:  it is alleging that the Individual Defendants are conducting an illegal enterprise within PG&E.  And in any case, Plaintiff contends that even if the Individual Defendants are acting at the behest of PG&E, a corporate employee acting within the scope of his authority can conduct the affairs of the corporation in a RICO-prescribed manner under *Cedric Kushner*.  *See* 533 U.S. at 164-65.

Before addressing Defendants' distinctiveness argument, the Court finds that Plaintiff has sufficiently pled the other elements of an associated-in-fact RICO enterprise. Plaintiff alleges that the Individual Defendants are a group of persons who conspired to form a continuing organization within PG&E that exists to intentionally defraud Plaintiff through the various schemes set forth in the complaint. Compl. ¶¶ 91-102, 108-09. These allegations sufficiently plead that the Individual Defendants had the common purpose of defrauding Plaintiff to harm its competitive position in the natural gas market and engaged in a continuing course of conduct to accomplish that end through the alleged schemes. *See Boyle*, 556 U.S. at 946; *Odom*, 486 F.3d at 552. It is true that Plaintiff's allegations about coordination among the Individual Defendants are somewhat sparse, Compl. ¶¶ 94, 97, 108-09, but the Ninth Circuit has held "it is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role," *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir. 2015) (citation omitted). Drawing all inferences in Plaintiff's favor, as the Court must at the dismissal stage, the complaint states facts sufficient to infer RICO coordination among the Individual Defendants. *See Odom*, 486 F.3d at 552 (holding that coordination was sufficiently pled where alleged RICO persons "established mechanisms for transferring . . . financial information" in a RICO-prescribed manner). Accordingly, because Plaintiff alleges that the Individual Defendants have a common purpose, a continuing course of conduct, and coordination among them, these requirements of an association-in-fact are met.

Turning to the issue of distinctiveness, the Court finds at this stage that the so-called Consolidated Billing enterprise Plaintiff alleges is sufficiently distinct from the Individual Defendants for the purpose of RICO.

As an initial matter, it is somewhat unclear whether Plaintiff is alleging that the Individual Defendants were acting within the scope of their employment. The complaint alleges both that PG&E did *and* did not direct or ratify the Individual Defendants' alleged conduct. *See* Compl. ¶101 (describing pattern of racketeering and alleging on information and belief that "*PG&E is doing the same thing to other competitive retailers*") (emphasis added); *id.* ¶ 102 (alleging that Individual Defendants "informed North Star that the Schemes constituted *PG&E's* regular manner of doing business") (emphasis added); *id.* ¶ 113 ("PG&E is distinct from the Consolidated Billing

program operated by [the Individual Defendants]"); *id.* ¶ 116 ("PG&E exercised control over [the Individual Defendants'] racketeering activities.").  It appears that Plaintiff is arguing PG&E was not directing the RICO conduct, but is still liable under a theory of respondeat superior because the Individual Defendants were always under its control.  *See* Dkt. No. 45 at 47 ("[I]f [employees] are doing their job within the scope of their employment in a RICO-forbidden way, that is distinct enough for purposes of the enterprise test . . . .").  To the extent that Plaintiff has alleged inconsistent claims or facts, the Federal Rules permit this: "A party may state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).  The Court addresses both possibilities.

To the extent that Plaintiff is alleging the Individual Defendants were not acting within the scope of their employment, the Court finds that the distinctiveness requirement has been satisfied. There is no question that the RICO Act proscribes employees from using their jobs as a vehicle to conduct a racketeering enterprise.  *See Cedric Kushner*, 533 U.S. at 164 (§ 1962(c) "protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed").  The fact that the Individual Defendants' activities would not necessarily economically inure to their benefit, but to PG&E's, is irrelevant to the analysis.  *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994) (holding that RICO contains no economic motive requirement).  The other court in this district considering a similar action against PG&E reached the same conclusion.  *See United Energy*, 2015 WL 7351385, at *9 ("[W]hile the individual defendants here undertook their actions in connection with PG&E's corporate affairs, [the plaintiff] does *not* aver PG&E instructed the employees to dispatch fraudulent bills or commit wire fraud . . . As a result . . . [the plaintiff] targets a person and an enterprise that is not simply the same person referred to by a different name.") (quotation marks and citation omitted).  Accordingly, Plaintiff states a RICO claim under this theory.

Additionally, to the extent that Plaintiff is alleging the Individual Defendants *were* acting within the scope of their employment, in that they were acting at the behest of PG&E, that would also satisfy the distinctiveness requirement.  To explain why, the Court begins with *Cedric Kushner*, the Supreme Court's most substantive discussion of the issue.  In that case, the sole

shareholder of a closely-held corporation was sued under § 1962(c) for allegedly conducting his company's affairs as a RICO enterprise through a pattern of fraud and other predicate crimes. 533 U.S. at 160. The trial court dismissed the RICO claim and the Second Circuit affirmed on the grounds that a plaintiff cannot state a claim under § 1962(c) unless it pleads the existence of two separate entities, a person and a distinct enterprise, the affairs of which that person conducts. *Id.* The Second Circuit reasoned that because the defendant was an employee acting within the scope of his authority (albeit his own), he was not a separate person from his company for the purpose of RICO. *Id.* Without a distinct person *and* an enterprise, the appellate court held that § 1962(c) did not apply. *Id.* The Supreme Court agreed with the premise that a plaintiff asserting a claim under § 1962(c) needs to plead the existence of two distinct entities, a person and an enterprise that is not simply the person by another name. *Id.* at 161-62. Put simply, a person who *uses* an enterprise as a tool to commit a pattern of racketeering activity cannot also *be* the enterprise being used. *Id.* at 162.

But the Supreme Court rejected the notion that a "corporate employee, acting within the scope of his authority," is not "distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status" merely because he is acting within the scope of his authority. *Id.* at 162. The court stated that "the appellate court's critical legal distinction—between employees acting within the scope of corporate authority and those acting outside that authority—is inconsistent with [that] basic statutory purpose." *Id.* at 165. Otherwise, enterprises with a criminal purpose would not be subject to RICO. For that reason, the fact that the defendant was the sole owner was immaterial to the analysis. *Id.* at 164-65 ("A corporate employee who conducts the corporation's affairs through an unlawful RICO 'pattern . . . of activity' uses that corporation as a 'vehicle' whether he is, or is not, its sole owner.") (internal citation omitted). In short, *Cedric Kushner* stands for the proposition that persons acting within the scope of their employment, as a company's authorized agents, can use the company they work for as a RICO enterprise without collapsing the distinction between themselves and the company.

For this reason, *Cedric Kushner* compels the conclusion that Plaintiff has sufficiently alleged distinctiveness here. The Individual Defendants (the alleged RICO persons) are formally

34

United States District Court
Northern District of California

1    separate from PG&E, just as Don King was separate from Don King Enterprises in *Cedric*

2    *Kushner*.  And the Individual Defendants are also formally separate from the "Consolidated

3    Billing" association-in-fact (the alleged RICO enterprise).  That is all that RICO requires.  In other

4    words, the Individual Defendants are not PG&E, so even if the "Consolidated Billing" association-

5    in-fact is in some sense a sub-entity within PG&E, that does not pose any distinctiveness problem.

6    *See United States v. Mongol Nation,* 132 F. Supp. 3d 1207, 1220 (C.D. Cal. 2015) (explaining that

7    "individual defendants are always distinct from corporate enterprises because they are legally

8    distinct entities, even when those individuals own the corporations or act only on their behalf")

9    (quoting *In re ClassicStare Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013)).  As a matter of

10   law, therefore, the RICO persons here are not simply PG&E by another name.  Distinctiveness

11   would collapse if Plaintiff *named* PG&E as both the RICO person subject to liability and the

12   RICO enterprise, but without dispute Plaintiff has not done so here.  *See Lopez v. Dean Witter*

13   *Reynolds, Inc.*, 591 F. Supp. 581, 585 (N.D. Cal. 1984) ("[I]f an entity is the 'enterprise,' it cannot

14   also be the RICO defendant."); *see also Riverwoods Chappaqua Corp. v. Marine Midland Bank*,

15   30 F.3d 339 (2d Cir. 1994) (holding that there is no distinctiveness where a corporation is the

16   RICO person and together with all of its employees is the RICO enterprise).

17          Accordingly, the Court finds that Plaintiff has adequately alleged a RICO enterprise that

18   is distinct from the alleged RICO persons whether or not the Individual Defendants acted with

19   direction or support from PG&E.  The Court is compelled to reach this conclusion notwithstanding

20   its substantial concerns about the practical result of this rule in cases like this one.  The Individual

21   Defendants who make up the alleged association-in-fact are three out of 20,000 employees of

22   PG&E.  The current state of the law requires Plaintiff to invent a fictitious entity like

23   "Consolidated Billing" simply to get around the clear legal and practical impediments to suing

24   PG&E directly under RICO (since it is extremely unlikely that a 20,000-employee, legitimate

25   utility company meets the definition of a RICO "enterprise").  Plaintiff then attempts to bootstrap

26   its RICO claim against "Consolidated Billing" and the Individual Defendants into a respondeat

27   superior claim against PG&E itself, in effect accomplishing indirectly what the statutory definition

28   of "enterprise" almost certainly precludes it from doing directly.  In the Court's view, this type of

1   artificial, form-over-substance application of civil RICO is a very long way from the statute's

2   roots in prosecuting organized crime, and exemplifies why consideration of corrective action by

3   Congress is warranted.  *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) ("It is

4   true that private civil actions under the statute are being brought almost solely against legitimate

5   defendants, rather than against the archetypal, intimidating mobster.  Yet this defect -- if defect it

6   is -- is inherent in the statute as written, and its correction must lie with Congress.") (quoting

7   *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985).  Nonetheless, under the governing

8   law discussed above, Plaintiff has sufficiently alleged distinctiveness.

9                                    b)      *Pattern of Racketeering Activity*

10          Defendants next contend that Plaintiff did not adequately plead a "pattern of racketeering

11   activity."  MTD at 13-15.  "Racketeering activity" includes any act indictable under one of several

12   provisions of Title 18 of the United States Code (predicate acts).  *Rothman v. Vedder Park Mgmt.*,

13   912 F.2d 315, 316 (9th Cir. 1990); *see also* 18 U.S.C. § 1961.  A "pattern of racketeering activity

14   requires at least two acts of racketeering activity."  18 U.S.C. § 1961(5).  "Two acts are necessary,

15   but not sufficient, for finding a violation," *Howard v. Am. Online Inc.*, 208 F.3d 741, 746 (2000),

16   because "the term 'pattern' itself requires the showing of a relationship between the predicates and

17   of the threat of continuing activity," *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

18          The Court begins with whether Plaintiff has sufficiently pled the existence of two predicate

19   offenses, because that inquiry informs whether there is also a properly pled pattern of racketeering

20   activity.  Plaintiff alleges that the Individual Defendants committed numerous acts of wire fraud

21   by carrying out the various anti-competitive schemes outlined in the complaint.  "The elements of

22   wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to

23   further the scheme; and (3) a specific intent to defraud."  *United States v. Jinian*, 725 F.3d 954,

24   960 (9th Cir. 2013) (citation omitted); *see also* 18 U.S.C. § 1343 (wire fraud statute).  When wire

25   fraud is pled as a predicate offense under the RICO Act, it must be pled with particularity under

26   Federal Rule of Civil Procedure 9(b) like all other claims that sound in fraud.  *See Odom*, 486 F.3d

27   at 553-554 (applying Rule 9(b) pleading requirements to wire fraud allegations underlying RICO).

28          Defendants contend that Plaintiff has failed to plead wire fraud with sufficient particularity

United States District Court
Northern District of California

36

1    under Rule 9(b) because it purportedly did not plead the "time, place, and contents of all false

2    misrepresentations made by the [Individual Defendants], let alone the identity of the person(s)

3    making the representations." MTD at 14.  Plaintiff responds that it identified more than twenty

4    acts of alleged wire fraud involving the Individual Defendants, including the exact date and why

5    the statement was a misrepresentation.  MTD Opp. at 18-19.  Defendant did not respond in reply.

6          The Court finds that Plaintiff has pled the predicate acts of wire fraud with sufficient

7    particularity.  As an initial matter, Defendants do not challenge that Plaintiff has pled that the

8    Individual Defendants participated in a scheme to defraud, used interstate wires, or had the

9    requisite specific intent.  The challenge is only about whether Plaintiff has sufficiently alleged the

10   time, place, and manner of the predicate acts.

11         The allegations above that support the existence of an associated-in-fact RICO enterprise

12   also show the scheme and intent necessary to plead wire fraud.  Plaintiff avers that the Individual

13   Defendants directed and supervised various aspects of the anticompetitive schemes described in

14   the complaint in their roles at PG&E.  Defendant Robinson "directs her department to provide

15   [Plaintiff] with the [EDIs] containing the false information . . . and directs her department to

16   deceive [Plaintiff] when it inquires about these schemes." Compl. ¶ 95.  Defendant Torres

17   "oversees and directs the employees in Customer Operations to withhold payments from

18   [Plaintiff] . . . to apply PG&E electric credit programs . . . to [Plaintiff's charges] . . . [and] directs

19   the employees . . . to use customer care calls originating from [these schemes]." Id. ¶ 96.  And

20   Defendant Chen "oversees and manages the CTA program . . . manages and implements the

21   [various schemes] . . . [and] directs and coordinates these schemes between [the Individual

22   Defendants]." Id. ¶ 97.  Plaintiff also identifies over 20 different instances, including dates, in

23   which false information was transmitted to Plaintiff in EDIs or calls were made to customers in

24   which misrepresentations were made.  Id. ¶¶ 51, 64, 84.  This is sufficient under Rule 9(b) to

25   survive a motion to dismiss.  See Odom, 486 F.3d at 555 (explaining that the purpose of Rule 9(b)

26   is to allow the defendant to "prepare an adequate answer from the allegations").

27         The Court next considers whether Plaintiff has sufficiently alleged a "pattern" of wire

28   fraud that satisfies the requirements of the RICO Act.  Defendants contend that Plaintiff has failed

United States District Court
Northern District of California

37

to do so because it has not shown that these wire fraud activities are "open-ended and last[ed] longer than one year."  First, Plaintiff has pled at least two acts of racketeering activity, which meets the first necessary condition of a pattern.  *See* Compl. ¶¶ 51, 64, 84; 18 U.S.C. § 1961(5).  Second, Plaintiff has also pled a sufficient "relationship between the predicates" because the acts of wire fraud were all allegedly done in furtherance of a scheme to undermine Plaintiff's business.  *See* Compl. ¶¶ 57, 70, 82, 86; *Nw. Bell*, 492 U.S. at 239.  Third, Plaintiff has pled that the enterprise was ongoing for longer than one year, with a likelihood of continuing.  *See* Compl. ¶ 33, 92-94; *Nw. Bell*, 492 U.S. at 239.  Finally, Plaintiff has pled that these acts of wire fraud were connected to each of the Individual Defendants by alleging that they directed them to occur.  *See United Energy*, 2015 WL 7351395, at * 10 (holding that the plaintiff CTA pled adequately a pattern of racketeering activity because it "credits at least ten different acts to the direction and supervision of each individual defendant, even if they were working together").  For these reasons, the Court finds that Plaintiff adequately pled a pattern of racketeering activity.

In conclusion, the Court finds that Plaintiff has adequately pled its RICO claims.

### 2.   Sherman Act

Defendants next contend that Plaintiff did not properly plead its attempted monopolization claim under Section 2 of the Sherman Act.  To state an attempted monopolization claim, a private plaintiff must plead facts showing: (1) that an entity has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize the relevant market, (3) that the entity has a dangerous probability of achieving monopoly power in that market, and (4) that injury has resulted from an anticompetitive aspect or effect of its behavior.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *accord Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2007); *see also* 15 U.S.C. § 2 (proscribing any "attempt to monopolize" in interstate commerce).

Defendants argue that Plaintiff has failed to plead that PG&E engaged in exclusionary or predatory acts sufficient to constitute an antitrust violation.  MTD at 15.  Specifically, Defendants claim that PG&E's actions cannot result in antitrust liability because Plaintiff's participation in the consolidated billing program is optional.  According to Defendants, the only way that Plaintiff could state a Section 2 antitrust claim against it is if the consolidated billing program constitutes

38

an "essential facility," access to which is necessary to ensure competition in the retail natural gas market.  Plaintiff responds that it has properly alleged anticompetitive conduct by asserting that PG&E has acted in a tortious manner to cause its customers to revert back to PG&E's gas service. MTD Opp. at 20-22.  And Plaintiff argues that Defendants' invocation of the essential facilities doctrine is misplaced because CPUC requires PG&E to offer the consolidated billing program.

Plaintiff's claim appears to be predicated on a theory of anticompetitive conduct known as a "refusal to deal."  *See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) (analyzing the scope of antitrust liability for a firm that refuses to cooperate with its rival in a reasonable manner in the context of deregulation).  In their original moving papers, neither Defendants nor Plaintiff addressed the implications of *Verizon* for the attempted monopolization claim, although Defendants did recognize that this dispute implicates the essential facilities doctrine.  Each party submitted a supplemental brief on this issue at the Court's direction.

"The central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors."  *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 116 (1975).  For that reason, under antitrust law, "there is no duty to aid competitors."  *Verizon*, 540 U.S. at 411.  Indeed, "[t]he absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985).  But the "high value . . . placed on the right to refuse to deal with other firms does not mean that the right is unqualified."  *Id.*

To determine the scope of PG&E's potential liability on a refusal-to-deal theory of liability, the Court looks to *Aspen Skiing* and *Verizon.*  In *Aspen Skiing*, the Supreme Court considered whether a monopolist had any antitrust duty to continue engaging in a voluntary, joint marketing program with its only competitor.  The defendant owned three of four ski resorts in Aspen, Colorado, and the plaintiff owned the fourth.  *Id.* at 593-94.  For years, the parties had issued a joint ski ticket.  *Id.*  But after the plaintiff refused to accept a lower share of the joint proceeds, the defendant discontinued the program.  *Id.*  The plaintiff tried to re-create the joint

United States District Court
Northern District of California

1   ticket, in effect offering to buy the monopolist's tickets from it at retail price, but the defendant

2   refused to do even that. *Id.* In upholding a jury verdict finding that the defendant was liable under

3   Section 2 for monopolization, the Supreme Court held that there were "no valid business reasons"

4   for its refusal to deal with the plaintiff and that, as a result, its conduct was motivated by malice

5   against the plaintiff and improperly anticompetitive. *Id.* at 608-09.

6          The Supreme Court revisited this doctrine in *Verizon*, under facts that are materially almost

7   identical to the instant case. There, the defendant was a telecommunications company that used to

8   enjoy a monopoly over telephone service in its geographic market. 540 U.S. at 402. But Congress

9   decided to deregulate those markets and passed legislation to increase competition that required

10  monopolists to share their network with new market entrants. *Id.* As required by that legislation,

11  the defendant entered into "interconnection agreements" with rivals, detailing the terms on which

12  it would make its network elements available. *Id.* The state public utilities commission approved

13  these interconnection agreements and also monitored the defendant's compliance with regulatory

14  requirements governing its network-sharing duties. *Id.* at 402-03. As part of those duties, the

15  defendant was required to provide its competitors with access to its "operations support systems,"

16  a "set of systems used by incumbent [firms] to provide services to customers and ensure quality."

17  *Id.* at 403. The interconnection agreements specified the mechanics by which the defendant would

18  meet its obligation to provide operations support systems to new entrants: new entrants would

19  send service orders through an electronic interface with the incumbent's ordering system and then

20  the incumbent would fill the order and send confirmation back through the same interface. *Id.*

21         Within a few years, the new entrants complained that many orders were going unfilled, in

22  breach of the incumbent firms' duty to provide access to operations support systems functions. *Id.*

23  The plaintiff, a customer of one of the new entrants, filed suit against the defendant, alleging that it

24  had filled new entrants' orders on a discriminatory basis, thus impeding their ability to compete

25  with the defendant in the local telephone service market. *Id.* at 404. The result, the plaintiff

26  alleged, was to deter potential customers of the new entrants from switching to their service. *Id.* at

27  405. The trial court dismissed for failure to state a claim, but the court of appeals reinstated the

28  case. *Id.*

1   The Supreme Court reversed and held that the defendant's intentional inference with the

2   terms of its interconnection agreements with new entrants could not be the basis for a claim under

3   Section 2.  The court began by noting that even though "Congress created these duties [to require

4   optional operations support,]" that did not "automatically lead to the conclusion that they can be

5   enforced by means of an antitrust claim."  *Id.* at 406.  To determine whether antitrust liability

6   could exist, it turned its focus to *Aspen Skiing*, "the leading case for § 2 liability based on refusal

7   to cooperation with a rival[.]"  *Id.* at 408.  Stating that "*Aspen Skiing* is at or near the boundary of

8   § 2 liability[,]" the court explained that it was the "unilateral termination of a voluntary *(and thus*

9   *presumably profitable)* course of dealing [that] suggested a willingness to forsake short-term

10   profits to achieve an anticompetitive end."  *Id.* at 409.  But, in the case before it, the fact that the

11   defendant was statutorily compelled to cooperate with its rivals at a "cost-based rate of

12   compensation . . . tells us nothing about dreams of monopoly" because "the services allegedly

13   withheld are not otherwise marketed or available to the public."  *Id.* at 409-10.  For that reason, it

14   held that the defendants' "alleged insufficient assistance in the provision of service to rivals is not

15   a recognized antitrust claim under this Court's existing refusal-to-deal precedents."  *Id.*  The

16   Supreme Court has since characterized its holding in *Verizon* as follows: "a firm with no antitrust

17   duty to deal with its rivals at all is under no obligation to provide those rivals with a 'sufficient'

18   level of service."  *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 444 (2009).

19   There are strong parallels between *Verizon* and the instant case.  Like the defendant in

20   *Verizon*, PG&E is a deregulated monopolist that was statutorily compelled to provide optional

21   access to an internal operational service not available to retail customers under a regulator-

22   approved operations and services contract.  And like the plaintiff in *Verizon*, Plaintiff brings its

23   Section 2 claim under the theory that PG&E's discriminatory and tortious conduct in the

24   implementation of that optional program was insufficient under the terms of the contract and state

25   regulations.  Because the Supreme Court has made clear that Plaintiff's theory of antitrust injury is

26   not cognizable under Section 2, the Court dismisses Plaintiff's attempt to monopolize claim.

27   The Court next considers whether it should grant Plaintiff leave to amend its antitrust

28   claim.  This inquiry raises two distinct questions.  The first is whether Plaintiff can state a claim

United States District Court
Northern District of California

under the essential facilities doctrine. "The 'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1128 (9th Cir. 2004). To prevail on an essential facilities claim, a plaintiff must show "(1) that [the defendant] is a monopolist in control of an essential facility, (2) that [the plaintiff], as [the defendant's] competitor, is unable reasonably or practically to duplicate the facility, (3) that [the defendant] has refused to provide [the plaintiff] access to the facility and (4) that it is feasible for [the defendant] to provide such access." *Id.* at 1128-29. This issue was raised in *Verizon*. The Supreme Court explained that "the indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose." 540 U.S. at 411. "Thus, it is said that essential facility claims should . . . be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." *Id.* (quotation marks and citation omitted; ellipsis original). Whether such regulatory power exists is a question of law. *See id.*; *see also MetroNet*, 383 F.3d at 1130, n.11 (stating that *Verizon* evaluated the issue as a matter of law). The Court finds that because CPUC can compel access to PG&E's consolidated billing program, *see Hartwell*, 27 Cal. 4th at 277 (injunctive relief, contempt, mandamus, and penalties available in CPUC proceeding), Plaintiff cannot state an essential facilities claim against PG&E.

The second leave to amend issue is whether Plaintiff can state a Section 2 claim under a business torts theory of anticompetitive conduct. *See Safeway Inc. v. Abbott Laboratories*, 761 F. Supp. 2d 874, 896 (N.D. Cal. 2011) (discussing *Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768, 783-84 (6th Cir. 2002)). This line of cases suggests that it may be possible for a plaintiff to state a Section 2 claim where the discriminatory conduct by a defendant with market power is tortious and outside the scope of a state regulator to effectively control. *See Conwood*, 290 F.3d at 783-84 ("Isolated tortious activity alone does not constitute exclusionary conduct for purposes of a § 2 violation, absent a significant and more than a temporary effect on competition, and not merely on a competitor or customer."). Because the Court does not have sufficient facts before it to rule out the possibility that Plaintiff could state a claim under this alternative theory,

1     leave to amend is granted.

2                    3.        Breach of Fiduciary Duty

3             Defendant next moves to dismiss Plaintiff's claim for breach of fiduciary duty.  "In order

4     to plead a claim for breach of fiduciary duty, a plaintiff must show the existence of a fiduciary

5     relationship, its breach, and damage caused by the breach." *Benasra v. Mitchell Silberberg &*

6     *Knupp LLP*, 123 Cal. App. 4th 1179, 1183 (2004).  Because a fiduciary breach claim sounds in

7     fraud, it is subject to Rule 9(b)'s heightened pleading standards.  *United Energy*, 2015 WL

8     7351385, at *11 (citing *Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995)).

9             Defendants contend that Plaintiff cannot allege that it had a fiduciary relationship with

10    PG&E.  Under California law, "before a person can be charged with a fiduciary obligation, he

11    must either knowingly undertake to act on behalf and for the benefit of another, or must enter into

12    a relationship which imposes that undertaking as a matter of law." *Committee On Children's*

13    *Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 221 (1983), *superseded by statute on other*

14    *grounds as stated in Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227

15    (2006).  "The existence of a fiduciary or confidential relationship is a question of fact, which the

16    party asserting the relationship has the burden of proving by a preponderance of the evidence."

17    *Kissling v. Wyndham Vacation Resorts, Inc.*, No. 15-cv-04004, 2015 WL 7283038, at *5 (N.D.

18    Cal. Nov. 18, 2015) (citing *Estate of Gelonese v. Balassi*, 36 Cal. App. 3d 854, 862 (1974)).

19            Here, Plaintiff alleges that it was in a fiduciary relationship with PG&E because PG&E

20    was its agent within the meaning of California Civil Code § 2295 with regard to its collections and

21    billing practices.  Compl. ¶¶ 131-32, 134.  An agent owes its principal a fiduciary duty of loyalty.

22    *United Energy*, 2015 WL 7351385, at *11 (citing *Michelson v. Hamada*, 29 Cal. App. 4th 1566,

23    1579-80 (1994)).  Accordingly, because the existence of a fiduciary relationship is a matter of fact,

24    Plaintiff has adequately alleged that PG&E was its fiduciary and therefore states a claim.

25                   4.        Intentional Misrepresentation

26            Defendants also allege that Plaintiff failed to state a claim for intentional misrepresentation

27    because it alleges only "billing error."  MTD at 20.  Under California law, "[t]o establish a claim

28    for deceit based on intentional misrepresentation, the plaintiff must prove . . . (1) the defendant

United States District Court
Northern District of California

43

1   represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the

2   defendant knew that the representation was false when the defendant made it, or the defendant

3   made the representation recklessly and without regard for its truth; (4) the defendant intended that

4   the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6)

5   the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a

6   substantial factor in causing that harm to the plaintiff. *Manderville v. PCG & S Grp., Inc.*, 146

7   Cal. App. 4th 1486, 1498 (2007) (citing Cal. Civ. Code §§ 1709-10).  Because this claim alleges

8   fraud, it is subject to Rule 9(b)'s heightened pleading standard.  *World Surveillance Grp. Inc. v. La*

9   *Jolla Cove Investors, Inc.*, No. 13-CV-03455, 2014 WL 1411249, at *3 (N.D. Cal. Apr. 11, 2014).

10          Here, Plaintiff alleges that Defendants made numerous representations in connection with

11   the various schemes identified in the complaint that it knew were false, and made them with the

12   intent that Plaintiff rely upon them in order to damage customer relations and withhold payments

13   owed.  *E.g.,* Compl. ¶¶ 46-51.  These allegations include specific times, dates, and reasons why

14   the representations were false.  *Id.*  Plaintiff also alleges that it relied on these misrepresentations,

15   as Defendants intended.  *See, e.g.*, *id.* ¶¶ 48-49.  Defendants' claim that Plaintiff does not allege

16   that they made misrepresentations to Plaintiff, but only to Plaintiff's customers, is inaccurate.  *See,*

17   *e.g.*, *id.* ¶ 51.  Accordingly, the Court finds Plaintiff has adequately pled a claim for intentional

18   misrepresentation.  *See United Energy*, 2015 WL 7351385, at **11-12.

19                        5.    Negligent Misrepresentation

20          Defendants also claim that Plaintiff failed to state a claim for negligent misrepresentation.

21   MTD at 20.  Under California law, to state a claim for negligent misrepresentation, a plaintiff must

22   allege: (1) misrepresentation of a material fact; (2) absent reasonable grounds for believing it to be

23   true; (3) intent to induce reliance in the plaintiff; (4) justifiable reliance by the plaintiff who is

24   unaware the representation is false; and (5) damages.  *Apollo Capital Fund LLC v. Roth Capital*

25   *Partners, LLC*, 158 Cal. App. 4th 226, 243 (2007).  While knowledge of falsity is not required, the

26   misrepresentation must be affirmative; omissions or implied representations are insufficient.  *Id.*

27   Most courts in this district hold state common law negligent misrepresentation claims to the

28   heightened pleading standards of Rule 9(b).  *See Jackson v. Fischer*, No. C 11-2753, 2013 WL

United States District Court
Northern District of California

1   6732872, at *17 (N.D. Cal. Dec. 20, 2013) (internal citations omitted).  For the same reasons

2   stated in connection with Plaintiff's intentional misrepresentation claim, the Court finds that

3   Plaintiff has adequately pled a claim for negligent misrepresentation.

### 6.   Intentional Interference with Contract

5          Defendants next claim that Plaintiff has failed to state a claim for intentional interference

6   with contract because Plaintiff alleged that Defendants acted in an agency capacity with respect to

7   its customers' service contracts.  MTD at 21.  Under California law, to state a claim for intentional

8   interference with contract, a plaintiff must allege: "(1) a valid contract between plaintiff and a

9   third party; (2) defendants' knowledge of the contract; (3) defendants' intentional acts designed to

10  induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the

11  contractual relationship; and (5) resulting damage."  *Guidiville Band of Pomo Indians v. NGV*

12  *Gaming, Ltd.*, 531 F.3d 767, 774 (9th Cir. 2008).  "California law has long recognized that the

13  core of intentional interference business torts is interference with an economic relationship by a

14  third-party stranger to that relationship, so that an entity with a direct interest or involvement in

15  that relationship is not usually liable for harm caused by pursuit of its interests."  *Marin Tug &*

16  *Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 832 (9th Cir. 2001).

17         Here, Plaintiff alleges that Defendants interfered with its third-party contracts with its retail

18  natural gas customers.  *See* Compl. ¶ 157.  Plaintiff does not allege that Defendants had any

19  "direct interest or involvement" through its role as billing and collections agent such that it cannot

20  be held liable for the conduct alleged.  *See United Energy*, 2015 WL 7351385, at **12-13; *cf.*

21  *ViChip Corp. v. Lee*, 438 F. Supp. 2d 1087, 1097-98 (N.D. Cal. 2006) (holding that a defendant in

22  a joint venture with the plaintiff had a direct interest in third-party contract that precluded claim

23  for contractual interference).  Accordingly, the Court finds that Plaintiff has adequately pled an

24  intentional interference with contract claim.

### 7.   Intentional Interference with Prospective Business Advantage

26         Defendants also argue that Plaintiff has failed to state a claim for intentional interference

27  with prospective business advantage because it has not identified any wrongful act by Defendants.

28  To state a claim for intentional interference with prospective business advantage under California

United States District Court
Northern District of California

45

United States District Court
Northern District of California

1    law, a plaintiff must allege: (1) an economic relationship between the plaintiff and some third

2    party with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of

3    the relationship; (3) intentional acts, apart from the interference itself, by defendant designed to

4    disrupt the relationship; (4) actual disruption; and (5) economic harm to the plaintiff proximately

5    caused by the acts of defendant. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

6    1134, 1153-54 (2003).

7           Here, Plaintiff alleges that Defendants interfered with its prospective economic gain by

8    intentionally seeking to induce the termination of Plaintiff's customers' accounts by making false

9    statements to them in customer care calls and in false EDIs sent to Plaintiff. Compl. ¶¶ 166-172.

10   Defendants' claim that Plaintiff has identified no "intentional act, apart from the interference

11   itself" is incorrect.  It is true that "a plaintiff seeking to recover for an alleged interference with

12   prospective contractual or economic relations must plead and prove as part of its case-in-chief that

13   the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in

14   conduct that was wrongful by some legal measure other than the fact of interference itself." *Della

15   Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995).  Tortious conduct that

16   is indistinct from or more than tangentially related to the conduct constituting the interference has

17   been held to be sufficient to state a claim. *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 341-42

18   (1997).  Plaintiff's allegations of intentional and negligent misrepresentation are sufficient to state

19   a wrong independent from the fact of interference.  Accordingly, the Court finds that Plaintiff has

20   adequately pled its claim for intentional interference with prospective economic advantage.

21                          8.    Unfair Competition

22          Lastly, Defendants argue that Plaintiff has failed to state a claim under California' unfair

23   competition law.  MTD at 23-25.  Section 17200 of California's Unfair Competition Law prohibits

24   all unlawful, unfair, or fraudulent business acts or practices.  Cal. Bus. & Prof. Code § 17200 *et

25   seq.*  Each of these three types of acts or practices are independently actionable; "a plaintiff may

26   show that the acts or practices at issue are either unlawful or unfair or deceptive." *Walker v.

27   Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1169 (2002).  "A business practice is

28   'unlawful' if it is forbidden by law." *Id.* (internal quotation marks omitted).

United States District Court
Northern District of California

Here, Plaintiff alleges a variety of unlawful acts, as discussed throughout this Order. This is sufficient to state a claim under the unlawful prong of California's unfair competition law. *See United Energy*, 2015 WL 7351385, at \*13 (citing *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (§ 17200 "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable")).

## V.    DEFENDANTS' MOTION FOR SANCTIONS

Defendants also move for sanctions against Plaintiff under Federal Rule of Civil Procedure 11 on the grounds that Plaintiff's RICO claims are frivolous. Rule 11 sanctions are appropriate when an attorney has certified "claims . . . [not] warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed. R. Civ. P. 11(b)(2). Where, as here, a "complaint is the primary focus of Rule 11 proceedings, a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005).

As set forth above in connection with Defendants' motion to dismiss Plaintiff's RICO claims for failure to state a claim, the Court finds that the allegations of wire fraud set forth in the complaint are not legally frivolous. Furthermore, Plaintiff appears to have conducted a reasonable inquiry before filing its RICO claims. Accordingly, Defendants' motion for sanctions is denied.

## VI.    CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to stay and/or dismiss as follows: (1) Plaintiff's claims for breach of contract and conversion are **DISMISSED WITHOUT PREJUDICE** in light of the forum selection clause in the parties' operating and services agreement; (2) Plaintiff's prayer for special damages with respect to his negligent misrepresentation claim is **DISMISSED WITH PREJUDICE** in light of the special damages waiver in the parties' operating and services agreement; (3) Plaintiff's claim for attempted monopolization under the Sherman Act is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure

12(b)(6), but the Court **GRANTS LEAVE TO AMEND** this claim within 30 days.  Additionally,

the Court **DENIES** Defendants' motion for sanctions under Federal Rule of Civil Procedure 11.

      **IT IS SO ORDERED.**

Dated:  9/26/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

48